SUPREME COURT.   Orange General Term, July, 1854.   *Brown,*
*Rockwell* and *Dean,* Justices.

### GEORGE LAKE, pl'ff in error *vs.* THE PEOPLE def'ts in error

Form of an indictment for murder, with counts at common law and under the
statute and form of a writ of error to remove a criminal case from the Oyer
and Terminer to the Supreme Court.   Opinions of medical witnesses upon
a case of alleged insanity, with their statements of the symptoms and
evidences of insanity.

Every man is presumed to be sane till the contrary be shown.   The burthen
of proof of insanity to overcome such presumption rests upon the accused.

The nature of the criminal act, the degree of motive, scientific opinions given
on the trial and the legal inferences from the conduct of the prisoner, dis-
cussed in the charge to the jury.

Where the question to be determined by the jury is the sanity of a person, both
the acts and declarations of the person are evidence for the purpose of ascer-
taining the state of mind of the actor.

Where, on a trial for murder, the defence set up is insanity, evidence may be
received of the acts and declarations of the accused, as well before and after,
as at the time of the homicide.

But it is not competent to prove the effect which the prisoner's conduct had
on the mind of another person on the day before the homicide, nor the acts
nor declarations of the person killed, then made, in the absence of the pris-
oner.   The previously expressed opinion of the person killed is not admissible
evidence on the question of insanity, nor would such person, if living, be
permitted to testify to such opinion.

If a medical witness has heard only a part of the testimony on which the
prisoner's counsel relies to establish his defence, it is erroneous to permit
such witness to give his opinion as to the prisoner's sanity, where such
opinion is founded on the portion of the testimony so heard by him.

To make the opinions of experts admissible, they must be founded on a given
state of facts, which should embrace all the facts relied upon to establish the
theory claimed.

Medical men are allowed to give their opinions in cases of alleged insanity,
because they are supposed by their study and practice to understand the
symptoms of insanity and to possess peculiar knowledge on that subject,
without which the jury could not be able to decide the question correctly;
but they should not be permitted to express such opinion, except on all the
testimony which is relied on to establish insanity.

A medical witness, examined as an expert on a question of insanity, may be
asked his opinion as to a hypothetical statement of facts; he may also be asked
what are the symptoms of insanity.   Whether such facts exist or such
symptoms are proved it belongs exclusively to the jury to decide.

Where a record of conviction of a witness, for petit larceny, is offered in evidence for the purpose of discrediting such witness, it is not a good ground for rejecting such evidence, that it related to a transaction which occurred more than twenty five years before, though such evidence unaccompanied by proof of subsequent bad character, is entitled to but little weight.

An indictment for the crime of murder was found against the plaintiff in error in the Dutchess Oyer and Terminer in the following words:

*Dutchess County, ss:* The jurors of the people of the state of New York, in and for the body of the county of Dutchess, upon their oaths and affirmations, do present that George Lake, late of the Town of La Grange, County of Dutchess, and State of New-York, laborer, not having the fear of God before his eyes, but being moved and seduced by the instigation of the devil, on the seventh day of June, in the year one thousand eight hundred and fifty-three, with force and arms, at the town of LaGrange, in the county of Dutchess aforesaid, in and upon one Hannah Cromwell, otherwise called Hannah Lake, in the peace of God and of the said people of the state of New York, then and there being then and there feloniously, willfully and of malice aforethought, did make an assault, and that the said George Lake, with force and arms, with a certain axe, which he the said George Lake then and there held, in his hands, the said Hannah Cromwell, otherwise called Hannah Lake, in and upon the head of her the said Hannah Cromwell, otherwise called Hannah Lake, feloniously, willfully, and of malice aforethought, did strike, beat and cut, giving her the said Hannah Cromwell, otherwise called Hannah Lake, by such striking and beating and cutting, one mortal wound, in and upon the head of her said Hannah Cromwell, otherwise called Hannah Lake, and in and upon the left side of the head of her said Hannah Cromwell, otherwise called Hannah Lake, of the length of three inches and of the depth of one inch, of which said mortal wound, she, the said Hannah Cromwell, otherwise called Hannah Lake, on the said seventh day of June, in the year one thousand eight hundred and

fifty three, aforesaid, at the town and in the county aforesaid did languish, and languishing did live, until the eleventh day of the same month of June, and afterwards, to wit on the said eleventh day of June, in the year and at the place last aforesaid, the said Hannah Cromwell, otherwise called Hannah Lake, of the said mortal wound died; and so the jurors aforesaid, upon their oaths and affirmations aforesaid, do say that the said George Lake, the said Hannah Cromwell, otherwise called Hannah Lake, in manner and form aforesaid, feloniously, willfully, and of malice aforethought did kill and murder, against the peace of the people of the state of New York, and their laws, and dignity, and against the form of the statute in such case made and provided.

And the jurors aforesaid upon their oaths and affirmations, aforesaid, do further present that George Lake, late of the town of LaGrange, in the county of Dutchess and state of New York, laborer, not having the fear of God before his eyes, but being moved and seduced by the instigation of the devil, on the seventh day of June in the year one thousand eight hundred and fifty-three, with force and arms, at the town of LaGrange, in the county and state aforesaid, in and upon one Hannah Cromwell, otherwise called Hannah Lake, in the peace of God and the people of the said state, then and there being, then and there feloniously, willfully, unlawfully, and from a premeditated design to effect the death of the said Hannah Cromwell, other-wise called Hannah Lake, did make an assault, and the said George Lake, with a certain axe made of iron and steel, of the value of one dollar, which he the said George Lake, in his hands then and there held, the said Hannah Cromwell, other-wise called Hannah Lake, in and upon the left side of the head of her, the said Hannah Cromwell, otherwise called Hannah Lake, just above the ear of her the said Hannah Cromwell, otherwise called Hannah Lake, then and there unlawfully, willfully, maliciously, and of his malice aforethought, did strike, thrust, beat and cut, giving to the said Hannah Crom-well, otherwise called Hannah Lake, then and there, with the axe aforesaid, in and upon the left side of the head of

Vol. I.                    ·        63

her the said Hannah Cromwell, otherwise called Hannah Lake, just above the ear of her the said Hannah Cromwell, otherwise called Hannah Lake, one mortal wound, of the length of three inches, and of the depth of one inch, of which said mortal wound the said Hannah Cromwell, otherwise called Hannah Lake, from the said seventh day of June in the year last aforesaid, until the eleventh day of June, in the same year, at the town aforesaid, in the county aforesaid, did languish, and languishing did live, on which said eleventh day of June in the year aforesaid, the said Hannah Cromwell, otherwise called Hannah Lake, at the town of LaGrange aforesaid, in the county aforesaid, of the said mortal wound did die; and so the jurors aforesaid, upon their oath aforesaid, do say, that the said George Lake her the said Hannah Cromwell, otherwise called Hannah Lake, in the manner and by the means aforesaid, feloniously, willfully, unlawfully and of malice aforethought, and with a premeditated design to effect the death of the said Hannah Cromwell, otherwise called Hannah Lake, did kill and murder, contrary to the form of the statute in such case made and provided, and against the peace of the people of the state of New York, and their laws and dignity.

And the jurors aforesaid, upon their oaths and affirmations aforesaid, do further present that George Lake late of the town of La Grange, in the county of Dutchess and state of New York, laborer, not having the fear of God before his eyes, but being moved and seduced by the instigation of the devil, on the seventh day of June in the year one thousand eight hundred and fifty-three, with force and arms, at the town aforesaid, in the county aforesaid, in and upon one Hannah Cromwell, otherwise called Hannah Lake, in the peace of God and the said people then and there being, then and there, feloniously, willfully, and of his malice aforethought, did make an assault, and that the said George Lake, with a certain axe and a certain sword which he the said George Lake in his hand then and there had, and held, the said Hannah Cromwell, otherwise called Hannah Lake, in and upon the head, neck, arms, legs, and body of her the said Hannah Cromwell, otherwise called

Lake *v.* The People.

Hannah Lake, then and there feloniously, wilfully and of his malice aforethought, did strike, cut and thrust, giving to the said Hannah Cromwell, otherwise called Hannah Lake, then and there, with the axe and sword, aforesaid, in and upon the head, neck, arms, legs and body, of her the said Hannah Cromwell, otherwise called Hannah Lake, several mortal wounds, to wit: one mortal wound on the right side of the head of her said Hannah Cromwell, otherwise called Hannah Lake, of the depth of one inch and the length of four inches, one mortal wound on the left side of the head of her the said Hannah Cromwell, otherwise called Hannah Lake, of the length of four inches, and of the depth of one inch, one mortal wound on the neck of her the said Hannah Cromwell, otherwise called Hannah Lake, of the length of three inches, and the depth of two inches, one mortal wound on the top of the head of the said Hannah Cromwell, otherwise called Hannah Lake, of the length of three inches and of the depth of two inches of which said mortal wounds the said Hannah Cromwell, from the said seventh day of June in the year aforesaid, until the eleventh day of June in the year aforesaid, of the town aforesaid and the county aforesaid, did languish and languishing did live, on which said 11th day of June in the year aforesaid, the said Hannah Cromwell, at the town aforesaid, in the county aforesaid, of the said mortal wound aforesaid, died; and the jurors aforesaid, upon their oaths aforesaid do say that the said George Lake the said Hannah Cromwell, otherwise called Hannah Lake, in manner and form aforesaid, feloniously, willfully and of his malice aforethought, did kill and murder, contrary to the form of the statute in such case made and provided and against the peace of the people of the state of New York, and their laws and dignity.

And the jurors aforesaid, upon their oaths and affirmations aforesaid, do further present that George Lake, late of the town of LaGrange in the county of Dutchess and state of New York, laborer, not having the fear of God before his eyes but being moved and seduced by the instigations of the devil, on the 7th day of June, in the year 1853, with force and arms at the town

aforesaid in the county aforesaid, in and upon one Hannah
Cromwell otherwise called Hannah Lake, in the peace of God
and the people of said state then and there being, then and
there feloniously, willfully, and of his malice aforethought and
from a premeditated design to effect the death of said Hannah
Cromwell, otherwise called Hannah Lake, did make an assault,
and that the said George Lake then and there with force and
arms and with certain instruments yet to the jurors aforesaid
unknown which he the said George Lake then and there had
and held in his hands of him the said George Lake the said
Hannah Cromwell otherwise called Hannah Lake in and upon
the head, face, and neck of her the said Hannah Cromwell
otherwise called Hannah Lake, feloniously, willfully and of
malice aforethought and from a premeditated design to effect the
death of the said Hannah Cromwell, otherwise called Hannah
Lake, did strike, beat, cut, then and there giving her the said
Hannah Cromwell otherwise called Hannah Lake, by such
striking, beating, cutting, divers mortal wounds and contusions
in and upon the head, face and neck of her the said Hannah
Cromwell otherwise called Hannah Lake, to wit: one mortal
wound on the left side of the head of her the said Hannah
Cromwell otherwise called Hannah Lake just above the ear of
the length of four inches and of the depth of two inches, also
one other mortal wound on the right side of the head of her
the said Hannah Cromwell otherwise called Hannah Lake, just
above the ear, of the length of five inches and of the depth of
two inches; also one mortal wound on the top part of the head
of her the said Hannah Cromwell otherwise called Hannah
Lake above the wound aforesaid on the left side of the head of
the said Hannah Cromwell otherwise called Hannah Lake of
the length of five inches and the depth of two inches, and
divers other mortal wounds in and upon the head, face and
neck of her the said Hannah Cromwell otherwise called Han-
nah Lake, of which said mortal wounds and bruises the said
Hannah Cromwell otherwise called Hannah Lake, from the
said seventh day of June in the year aforesaid until the
eleventh day of the same month of June, in the year aforesaid,

at the town aforesaid, in the county aforesaid did languish and languishing did live, on which said eleventh day of June in the year aforesaid the said Hannah Cromwell otherwise called Hannah Lake at the town and county aforesaid of the said mortal wounds and contusions aforesaid died; and so the jurors aforesaid upon their oaths and affirmations aforesaid do say that the said George Lake the said Hannah Cromwell otherwise called Hannah Lake in manner and form aforesaid feloniously, willfully and of malice aforethought and from a premeditated design to effect the death of the said Hannah Cromwell otherwise called Hannah Lake did kill and murder contrary to the form of the statute in such case made and provided and against the peace of the people of the state of New York and their laws and dignity.

A plea of *not guilty* was interposed, and on a trial before the Dutchess Oyer and Terminer, the plaintiff in error was convicted and sentenced to be executed. Proceedings were subsequently stayed and the cause was brought into this court by a writ of error and allowance in the following words:

The people of the state of New York to Seward Barculo, Egbert Q. Eldridge, and Rensselaer Case, Supreme Court Justice, County Judge, and Justice of the Sessions, forming the Court of Oyer and Terminer, in and for the County of Dutchess, sitting at Poughkeepsie, in said county, on the 4th Monday of September, 1853.

Because in the record and proceedings, and also in the giving of judgment, upon an indictment against George Lake, of the town of LaGrange, in said county, for the murder of Hannah Cromwell, *alias* Hannah Lake, of said town of LaGrange, which was tried before you at said term of said court of Oyer and Terminer, manifest error has intervened to the great damage of the said George Lake, as by his complaint we are informed. We being willing that the error, if any there be, should in due manner be corrected, and full and speedy justice done in this behalf, do command you, that if judgment be

thereupon given, then you send to our justices of our Supreme Court, distinctly and openly, under your seal, the record of that judgment and proceedings, upon the indictment aforesaid, with all things concerning the same, and that you cause this writ and the return thereto to be filed, forthwith, in the office of the clerk of the Supreme Court, of our said state, in the said county of Dutchess, after the service of this writ, that the record and proceedings aforesaid, being inspected, we may cause to be further done thereupon, for correcting that error, what of right, and according to the law and custom of the state of New York, ought to be done. Witness Seward Barculo Esquire, one of the justices of our said court, at Poughkeepsie, this 3d day of December, A. D. 1853.

George H. Tompkins, Clerk.

H. & M. HALE, Attorneys.

I hereby allow the foregoing writ of error and expressly direct that the same shall operate as a stay of execution and of all proceedings on the judgment upon which said writ is brought.

S. BARCULO,
Justice of the Supreme Court.

Dated December 3d, 1853.

By the return to the writ of error, it appeared the indictment was tried at the Dutchess Circuit before *Barculo*, J., of the Supreme Court, assisted by *Eldridge*, County Judge, and *Case*, Justice of the Sessions, on the 26th day of September, 1853, when the following proceedings took place:

The district attorney first introduced, as a witness in behalf of the people,

*Henry Robinson*, who, being duly sworn, said that he was acquainted with the prisoner at the bar, lived 200 or 250 rods from where the prisoner formerly lived, in the town of La-Grange. On the 7th day of June last, between 10 and 11 o'clock, A. M., he saw Hannah Cromwell or Lake, coming out of the house, Lake (the prisoner) close behind her. Lake

Lake *v.* The People.

whirled her round, and dashed her head towards the door, he then stepped round on the west side of the post, and took up, I thought it was an axe, and struck her; I heard the woman halloo "Oh George! don't kill me," and repeat it twice. This was before he struck her, I then went after help, and when we came back Hannah lay in the same spot where I saw her before. I didn't go to the house; saw her brought from the house in a wagon; couldn't tell from her appearance whether she was dead or alive; saw her again, dead, the day she was buried, four or five days after I saw her hurt.

The district attorney next put upon the stand, *Dr. Samuel Dodge* who testified that he was a physician, residing in Union Vale, that he saw Hannah Cromwell or Lake, about the 7th of June last, when she was injured, and he then examined her wounds, and found a fracture of the skull and several cuts in the scalp, that she was carried to a house and remained about three days and died, that the cause of her death was the wound spoken of.

On his cross-examination this witness testified, that the fracture was about an inch or inch and a half above the ear, the brain was protruding; it might have been made with an axe; the scalp was injured, I suppose by falling; I saw the children, the youngest had one side of the head cut through and down through the lower jaw, it was not such a wound as would have been inflicted with an axe, it was too long; one child was a year and a half old, the other three years; the skull of the oldest child was broken and a piece carried away, as if with a club or bludgeon; I saw Lake three or four weeks before the occurrence; he was in the habit of treating his family as well as any other man would; he lived with the woman as his wife, he called on me to visit her professionally as his wife; I never saw him drink, I don't know as I ever saw him unduly excited by liquor.

The district attorney next called, in behalf of the people, *Carpenter D. Townsend,* who testified as follows:

I live at LaGrange; know prisoner; have known nim by sight ten or twelve years; have not seen him very frequently;

about as often as three or four times a year; took him in cus-
tody as an officer for the offence; had him in charge the next
night; talked with him there; he said he killed this woman
Hannah Cromwell *alias* Lake; he said that she had a deed
which he had given her, which he wanted her to give back to
him, but she refused to do so; he said that was the reason why
he killed her; he thought that if she had given up the deed she
would still have been living; had a conversation with him
after that; he would talk with me till I had delivered him to
the sheriff; he conversed freely and calmly whenever I talked
to him; have seen him since in jail, but he would not talk with
me; don't think that I have ever seen him at work on his place;
understood him to be a clock repairer, have seen him at work
at it; saw him repair a clock in 1849.

Cross-examination by Mr. Hale: I asked him if he had given
her a deed, he said he had; asked him if he had tried to make
her give it up, he said he had; I have acknowledged to you
(Mr. Hale) that prisoner said that if she had given up the pa-
per he would not have killed her; prisoner appeared to make
an effort to appear strange, I said he did tolerably well for a
green hand; could not explain how he acted exactly, but he
produced upon my mind the impression that he tried to appear
strange; when he had time for reflection he would sometimes
give a vague answer, but when he was pressed he would talk
as usual; asked him why he had killed his children, he replied
" that as he had commenced the job, he thought he would finish
the breed;" he gave a detailed account of the occurrence; he
said he killed the woman first; he threw her down upon the
door step and killed her with an axe; he said he next took the
older child and dashed it against the door steps, he thought
that killed it; he did not strike it with a weapon; he killed
the other with an axe; it was up stairs; he killed it with an
axe and threw it out of the window: was at the house; did not
see him shot; he was bleeding when arrested; I saw blood in
the room where he was arrested; did not see marks of violence
on any furniture; have never seen him intoxicated; when I
first saw him, he was out of the house and nearly naked; he

had on a garment I supposed to be a woman's night gown; he had on no other clothes; this was about 2 o'clock in the after noon.

Direct resumed—I washed his wounds with water; had a conversation with Mr. Hale in his office; the conversation I had with prisoner commenced by my asking him if he had given the woman a deed of the place where he lived; he said he had; I then inquired of him whether he had tried to make her give it up. He said he had, and she refused to do so; asked him if that was the çause of his killing her. He said that it was; he further said that if she had given up the paper she would have been still living.

The district attorney then offered in evidence a deed from George Lake to Hannah Cromwell, of the premises upon which they resided, dated 21st January, 1853, recorded Feb'y, 1853. It was read to the jury.

*George Cromwell* sworn for the prosecution:—I knew Hannah Cromwell; she was my daughter; guess she was never married to George Lake; never knew they were married; if she was living she would be 24 years old the 25th of this month; she commenced to live with prisoner about 3 years ago last January; knew Lake about 4 years before he lived with Hannah; Hannah's sister lived in the same house with Lake; Hannah used to go down there to see her; Lake brought her home twice.

The prosecution here rested.

*Levi Vincent* was then sworn for the prisoner, and testified as follows: I was present at the house of the accused on the 7th of June last; Cyrus Perkins came to my house about the middle of the day, he came after me, we went to his house, we saw the prisoner in an upper room, standing before a window; he had nothing on but a woman's night gown; it had short sleeves; it came down about to the hips; it was while he stood there before the window flourishing a short sword; heard him say " all those that are in the right way shall not be destroyed, but them that ain't will;" he flourished his sword and said it was Gen. Washington's sword; I was about 12 rods from the house,

was in the road; saw two dead bodies lying in front of the house; one was the woman he called his wife; the other was his child; do not *know*, but think he could see the bodies from the window where he was standing; should think he could; he laughed sometimes, sometimes sung; and sometimes he appeared to be dancing; did not see him cry; remained there at the house one hour and a half or two hours; this course continued nearly all the while; we commenced breaking up the floor about one hour after I got there; we tore up the floor with an axe; saw him pass the window; he was walking around the floor in a circle while we were breaking up the floor; the sword was pointed down most of the time, his head down too; he kept moving so, with his head down; he continued to do so until we tore up the second board in the floor, then he left; don't know where he went till he was shot; the blood was running from his arm in quite a stream; it was running from his face, arm and breast; a good deal of blood came from him; about half a pint; might have been more or less; some of the company then went up and took him out and put him on a straw bed; Stephen Manchester, Archibald S. Colwell, Edwin Colwell, Hubbart Duncan, Alfred Van Black, Washington Vincent, Cyrus Perkins and Jonathan Moore were near there and a good many more; the windows were broken out, beds were thrown out of doors, some stove pipe, some bedsteads, tables, and a rifle; the rifle appeared as if it had been struck with an axe or some sharp instrument; it was cut on the breech, and on the barrel; saw marks of an axe on the bureau and clock; they appeared as though they had been struck with a dull axe; they were pretty well broken up; had not seen Lake for a week and a half before this; then saw him pass on the road; he was driving his horse; he drove much slower than I had formerly seen him do; he did not appear to notice me; he looked more wild out of his eyes and appeared more downcast than usual; when I first saw him he was turning his wagon around in the road; I spoke to him but he did not reply ; he turned his wagon twice round; he was in the act of turning round when I saw him; he looked wild; this was a few days before the tragedy;

I live about half a mile from him; am a blacksmith, farm it sometimes; never saw but that he was kind to his family; never have seen anything but what he was kind towards his children; after he was arrested, I searched the house a good deal to find some liquor, but found none, or any fire-arms, found no powder or balls or any ammunition; his place was worth about two hundred and fifty or three hundred dollars.

Cross-examination:—Don't know that he was worth any other property besides his place; have known him since he was a boy; know his father; live about a mile and a half from where Lake lived; prisoner has one sister living; no brother, no mother living; did not propose to knock him on the head with a hammer because he was ugly; saw no hammer there; when I first arrived there my attention was attracted by his halooing and flourishing his sword; could see him walk around in a circle; could not say what he went around to see; don't think I heard him say anything about shooting; don't recollect that he said he would kill any one who tried to arrest him; all hands appeared to be afraid to go and arrest him; saw blood run from his arm in a stream; when we were breaking through the floor he kept walking in a circle; he continued to do so; they laid him on a bed when they fetched him out; have known him from a child; the last time I saw him before was about a week and a half before the tragedy; he was working on his place; he was in a field; don't know what he was doing; he appeared to be planting corn; this was about one week and a half after I saw him in the road; I was going east at the time I saw him on the road; his wife and child were with him; this was the time I saw him turn around; I bowed to them; neither one of them spoke; he was in the act of turning around when I just saw him; he turned away around again, then passed on; he was rather reserved; he was always a person of few words: he was not always short or abrupt in conversation; have had a considerable conversation with him about his place; don't know that I ever saw him enter into extended conversation with any one; saw marks of violence before I went into the house; a piece of a chest split off and a rifle; don't know when the

chest was split; don't know how the marks were made on the furniture in the house; he made a loud noise, heard it nearly to the house where I lived which was over half a mile; a loud, boisterous noise, like preaching; was present at an examination of the prisoner 4 or 5 weeks previous, before a magistrate; he appeared strange, his eyes looked wild and his face appeared to twitch.

*Polly Phillips* sworn. I live a fourth of a mile from Lake; have lived in the vicinity eight years; saw prisoner the night before this tragedy; I went there to see him; it was on Monday between five and six P. M.; saw him and his family; he was sitting on a bureau in the northeast corner of the room; he was sitting on a bureau with his feet in a drawer. I asked him to go and fix a clock for me, but he would not notice me; his wife spoke to him and told him I came to get him to fix a clock, but he would not notice her. I could not understand all he said; once in a while he would slap his hand and say, "well, there—and no mistake." She repeated to him many times about my coming to get him to fix a clock; so did I, but he would not pay any attention to us. He repaired clocks. When I went to go down from his room the last time, I think he said, "Poll Phillips." I observed that he laughed and cried both; put his hand up to his head and rubbed his head and kept spitting; he would raise up and press his head against the wall, as he sat on the bureau; he always treated his family well before this; he and the woman said they were married and called each other man and wife; I first saw Hannah that afternoon by the road.

The defendant's counsel then asked this witness, 'what was she doing when you saw her there?"

To this question the counsel for the people objected and the court sustained the objection and excluded the question, to which decision of the court defendant's counsel then and thereupon duly excepted.

Defendant's counsel then offered to show by this witness that the woman Hannah was then in tears. The court rejected the offer, to which rejection by the court defendant's counsel duly excepted.

Defendant's counsel then offered to prove from the declarations of Hannah, the night before the alleged murder, that the conduct of Lake had been so strange and unnatural, as to alarm the wife and family; that the wife exhibited this alarm the night before the alleged murder in complaints to the neighbors and to show what these complaints were.

This evidence the court refused to admit, to which refusal defendant's counsel thereupon duly excepted.

Defendant's counsel then offered to show the declarations of the wife and the expressions of alarm made use of by her the night before the alleged murder, as the effect from which the jury can reason to the cause, in the insanity of the prisoner; this offer the court rejected, unless made in prisoner's presence, and defendant's counsel thereupon duly excepted. The witness then proceeded to say, there were some bedclothes out of doors when I was there.

*Cross-examined*—I have known prisoner eight years; have seen him sometimes every day the last five years; he was a man of few words; I never heard him say a great deal; don't think he was blunt in his speech; have never seen him intoxicated.

*Catharine Johnson sworn*—I live at Pleasant Valley; knew Lake when he was a boy; I lived about a mile from him; saw him on the 6th of June last between 9 and 10 o'clock, A. M.; he was walking on his stoop, he was rubbing his head with his hands and making terrible shrieks; the noise was very loud and continued till I got out of hearing; could hear him over half a mile; saw him put his hands on his wife's neck, and hold his head on her neck, and cry very bitterly. I said nothing to him; was there about five or ten minutes; went by the house after that the same day; did not see him or hear any noise; have worked for him last winter when his wife was sick; never saw him do anything amiss to his family; never saw him act otherwise than kind and pleasant to his family; have been there to work perhaps a dozen times; went there at prisoner's request; was there when Hannah was confined; was there when she had her first and last child; he acted kind and tender to his family; never saw him out of the way with liquor.

*Cross-examined*—When I first saw him his wife was sitting on the step of the door; she appeared to sit there sewing; he was on the stoop walking backwards and forwards; he would first rub his own head and cry, then he would put his arms around her neck, with his face down her neck and cry; she did not raise up when he did so. I am not more friendly towards him than to his wife and children; have been in the house four or five times within the year past; the noise he made could be heard for half a mile; have been in the county jail a great many times. The district attorney here asked this witness the question, "Were you imprisoned in the county jail in 1827?" This question was objected to by defendant's counsel, as not being the best evidence of such imprisonment, if any there had been; this objection was overruled by the court and the question admitted, to which decision of the court defendant's counsel thereupon duly excepted. Witness declined answering the question, and the court refused to compel her to answer it, to which refusal the district attorney duly excepted.

*Direct resumed*—I am fifty-one years old; saw the prisoner in jail when he was confined, for shooting at his brotherinlaw, a few weeks before this occurrence; he then walked around the room and whispered a good deal to his wife; he cried when he took his children from my arms into his; he walked around and said if it was not for his wife and children he would as lief be there as anywhere; don't know as I am related to prisoner; could not tell whether he looked when he was in jail as he he looks now.

When the next witness (Dr. Varick) was called, the prisoner's counsel stated to the court that several medical witnesses were present, who desired to leave court as soon as possible, and requested the court to intimate what rule would be adopted in relation to the examination of those who had not heard all the testimony, and also in relation to the proper forms of questions to be put.

The court then informed the respective counsel that medical witnesses who had heard the principal facts of the case and enough of the testimony to form an opinion, might be examined

although they had not heard all the testimony, and that the question might be put to them whether from the testimony they considered the prisoner insane when the homicide was committed; but that the counsel would not be permitted to ask whether if certain facts and circumstances were true it indicated insanity.

*Dr. Richard A. Varick* was then sworn for the defence and testified as follows:   I have heard the testimony this morning; I think it indicates a condition of insanity at the commission of the act; I doubt that he was capable of knowing what he was doing; from my examination I think there is undoubtedly derangement of the brain to a considerable degree; from what I have observed, I think he is not in a sane state of mind now.

The defendant's counsel then asked this witness, " What would the fact that at the time of the killing of his family, the prisoner destroyed most of the furniture, broke out most of his windows and destroyed the window sashes indicate to your mind?"   To this question the counsel for the prosecution objected and the court sustained the objection and excluded the question; to which the defendant's counsel duly excepted.

The defendant's counsel then asked the question, " What would the fact that the prisoner perpetrated such an outrage as is indicated in the previous question in broad day light, accompanied by no attempt to escape or conceal the deed indicate to your mind?"   To this question the counsel for the prosecution objected, and the question was excluded by the court, to which decision of the court defendant's counsel thereupon duly excepted.

*Witness proceeded*—My reasons are his inattention to his counsel, his apparent indifference to his situation; wholesale murder indicates a state of insanity; have seen prisoner in jail three times; I was with other physicians; there is nothing to indicate violent passion at the time of the murder; this, with other circumstances, induces me to think him insane at the time of the offence.

*Cross-examined*—The symptoms of insanity in this man are stupidity, indifference in matters concerning life, unsteadiness

of the eye; I mean by stupidity, that he seems to be unaffected
by appeals made to him; he don't take the interest in the pre-
liminary steps to the trial that I should suppose he would; he
could probably take no better course to save his life; I don't
rely upon that entirely; I rely upon this as showing a continu-
ation of the same disease; I think any man, who *kills in this*
way without sufficient motive insane; a man, might kill in a
momentary passion; I consider that revenge might be a sufficient
motive; acquiring a large amount of property, or concealment
of a previous crime.

On his cross-examination, this witness was asked by the dis-
trict attorney the following question: "Do you consider killing,
unless with apparent motive, *prima facie* the act of an insane
man?" To this question defendant's counsel objected, but the
question was admitted by the court, to which admission defend-
ant's counsel then duly excepted.

Witness answered, I consider killing without some of these
motives *prima facie* evidence of insanity; I have considered the
man insane since he first came to jail; I now consider him in-
sane but can not say to what extent; a person may be insane
on a single subject and sane on all others and responsible for
his acts; as far as I can judge he is wholly insane; a man is
able to do a rational act, if he is wholly insane, and may be
insane while he does that act; I do not consider Lake a mono-
maniac; I am sufficiently acquainted with insanity to give an
opinion whether he was insane at the commission of the act.

*By the Judge*—I get my experience mostly from books and
partly from actual experience; I have examined his physical
situation as regards insanity, but found nothing especial; his
struggles while going in and out of court are worth nothing of
themselves.

*Levi Vincent* recalled—Prisoner was asked by Mr. Moore to
come down from where he was; he made a queer reply, and
laughed; he was asked the same question by some other person
and made the same sort of an answer.

*Jonathan Moore sworn*—I was at Lake's house on the day
of the murder; I was requested to go; got there about 1 o'clock;

we stopped on the way to get some assistance; when I first saw him he remarked, " you are a nice Quaker;" he said he also was a Quaker and always had been; I asked him to deliver himself up; he repeated my name twice in succession in a sneering manner; he then turned around from the window; he had a sword in his hand which he kept flourishing; he had nothing but a shirt on; he occasionally called aloud, and called me by name in a sort of a muttering way; a few days previous he was on examination for attempting to shoot his brother, and he wanted me to attend, but I told him that I could be of no use; that he had better get a person to go his bail or he would be locked up; he said that was impossible, and that he did not want a bondsman; I told him I would come according to his request and attend his trial; he stated he was to be tried for shooting his brotherinlaw.

*Cross-examined*—His reply to me was, " Just so, Jonathan Moore, down in the mud;" he repeated it three times.

*Elmore A. Vincent sworn*—I saw the prisoner in the road with a horse and wagon about the middle of last May; when I first saw him he was walking around the horse and wagon in a circle; his wife and child were with him; he went around so perhaps twelve or fifteen times; after walking awhile so he got in and drove forward about fifty or sixty rods; he then got out, took the horse by his head and turned him around for more than ten minutes; he then let the horse stand and walked himself around the horse and wagon about eight or ten times; he then got in and drove a little further, and then got out, took his horse by the head and turned around again about as long as he did the other time; he then got in and drove; went out of sight; his wife drove; have not seen him since till to-day.

*Cross-examined*—I looked at him; can not say he was or was not intoxicated at that time.

*William Able sworn*—Corroborated the evidence of E. A. Vincent.

*George Bostwick sworn*—I saw the accused on the 28th of April last; he was on his place at work making fence; I ar-

rested him and brought him to jail; I had a conversation when. I brought him to jail about security. He said he did not shoot at his brotherinlaw, but shot at a crow; he staid at my house one night in the month of May; at about 12 o'clock at night I heard a noise as though some one was crying, and then I heard a laugh—thought it was him.

*Cross-examined*—I do not know he made the noise; it came from that direction.

*Isaac Weeks sworn*—I saw prisoner about four or five days before the commission of this offence; he came to the shoe shop where I was at work and asked for some shoe thread; he asked for one ball of shoe thread, and then for two; we handed him two balls; he looked at them for a moment and then threw them both on the floor; he then looked at them for a moment and picked one up, paid for it, and went away; he was in the habit of coming for shoe thread, but not for quite awhile; he never acted so before.

*Dr. Charles H. Andrus sworn*—I have examined Lake since he has been in jail; the first time I saw him was two weeks since; he was sitting on his bed, with a testament in his hand, open; he did not appear to take much notice of us. His counsel told him we had come in to talk with him about his trial; asked him if he knew he was to be tried for the murder of his wife and children; he took no notice of what was said; his pulse was regular; he paid no attention to the question, what book he was reading; we undertook to take the book away, but he would not give it up; his counsel asked him if he knew what the effect of his being brought in guilty would be; it had no effect in quickening his pulse; we could perceive no emotion; we were in the cell one half or three quarters of an hour; he did not speak a word; we took the book from him by pulling it away. I was there three or four days after with Dr. Hillis; we found him standing in his cell opposite his window; we said, George, how do you do to-day? he replied, I guess George is pretty well; his pulse was quicker; he was asked if he knew he was going to be tried for killing Hannah, and what he had to say for himself; he said he had enough to say when the time

come; I think the expression was, " George can tell for him-
self." Dr. Hillis asked him what book he was reading the last
visit; he made no reply: the Doctor got the book and asked him
if he thought it was a good book, and if he found consolation
in it; he said the consolation was there, and it might stay there.
I asked him if he knew where his children were; he said he
hoped in a great deal better place than he was. This was ac-
companied with a kind of laugh. Dr. Hillis asked him if he
was aware of the consequences of his being brought in guilty;
he took no notice of it; he was asked if he knew he must be
hung; he said, " if they must hang, they must hang," with
another laugh. One of us asked how he could be so jolly on
such a serious matter; he said it was a serious matter, laughing
heartily; he said he did not know when he was brought here;
he only knew he was here, with a peculiar kind of expression
of countenance and more sober than usual. I was there again,
there was very little difference between the second and third
interview; he was not so talkative. When we came away one
of us took him by the hand, and he commenced weeping, and
while the tears were coursing down he broke out into an unna-
tural laugh; this continued a few moments; when asked what
was the matter, he made no reply: he hesitated to give me his
hand; he reached out his hand, and said it was in a poor con-
dition to take hold of, and when Dr. Hillis took hold of his
hand, he commenced sobbing aloud. When I next saw him
Dr. Varick was with us; he paid no attention to the question
what he wanted done; he was asked if he really did kill Hannah
and the children; he said with a laugh, there was more than my
hands in that. I say, unhesitatingly, that he is insane; I have
heard the testimony which has been given to-day; after hearing
the testimony I can say that it is my opinion that he was in-
sane at the time of the occurrence.

*Cross-examined*—I had formed an opinion before I heard the
testimony that he was insane at the time of the occurrence; I
pronounce this " *homicidal mania;*" I mean a disposition to
destroy not only human life but everything else; as far as I am
able to judge, he is wholly insane; I considered the answers

which he gave me in jail were irrational, that is, the particular words were not always irrational, but the manner of giving them; I was never in there withont one of his counsel.  His counsel said once, that we had come to see if he was insane; but not the first time; we did not talk freely in his presence; the remark about our coming to see if he was insane was made I think on the third visit; the symptoms are an inattention to what is said; a want of correct reasoning; there are peculiar expressions of the eye: I see it in Lake; a peculiar position of the head, holding it forward with a sort of blank expression of countenance; he would go from one extreme to another, laughing or weeping immoderately without assignable cause; I don't think a person could feign insanity and keep it up for several hours; sleeplessness is one of the accompaniments but not necessarily a symptom; insane persons are often troubled with constipation; *most insane persons are not as sensitive to bodily injury as sane persons*.  Persons afflicted with " homicidal mania" may be sensible of right and wrong, but unable to control themselves.   One peculiarity which I observed in this case was when a person's nostrils are dry it is impossible to start the secretion in the nose instantly as in this case, when commencing to weep.

*By the Judge*—I noticed an odor which I have noticed about insane persons who were confined; *the increase in the beats of* his pulse might have been caused by his physical exertions while we were there; there is a sort of shining and at the same time an intellectual dullness in his eye; *his head is in a* different position from what is usual.

*Direct resumed*—I should place no reliance on the peculiar odor spoken of, only in connection with other circumstances.

*Dr. M. H. Ranney sworn*—I reside at the New York city lunatic asylum; have been there nearly seven years; have had over 3000 insane persons under my care; I have examined the prisoner twice in his cell with Dr. Brown; on entering the cell the prisoner was at the window; he was spoken to but paid no attention to us; he commenced walking backward and forward in his cell; after a time he went to the door; placed his back

against it, using sufficient force to throw it open, although some one was behind it, and attempted to rush down stairs, but he was brought back to his cell; he said it was unfair to treat a man in that manner, and said he wanted to go down stairs and see his brother-in-law below. He answered some few questions, but refused to give any answers in relation to the committal of the homicidal act; I could obtain but little from his conversation; there is a dullness about him and no disposition to talk, and he seemed to take but little interest in things around him; I thought he was insane or simulated insanity; I examined him this morning in relation to matters generally; he conversed passably well, and while he was answering Doctor Brown I took down his answers formally; it made no difference in his answers; the subject was farming: most of his answers to the questions were correct When we referred to the homicidal act he would not give a direct answer. I conceived there might be a hidden delusion which he was unwilling to express; from this last examination I came to the conclusion that he was not simulating insanity, because it would require considerable knowledge of the disease to keep up the symptoms in a conversation; the forms commonly simulated are acute mania and stupidity; he did not simulate either of these forms: they generally overact when they simulate, but his answers were very proper except on the subject of the homicide. One can hardly distinguish insanity from the eye alone or from the expression of the face alone; have heard all the testimony; form my opinion from the testimony presented and from my examination; I regard it as sufficient evidence that he was insane at the time he committed the act and is insane now; if Mrs. Johnson's testimony was omitted or had not been given, my belief would still have been that he was insane. The reasons of my opinion are based on the eccentricities which existed previous to the act, which were the initiatory acts; from the want of an adequate motive for the killing of the children, and from his present condition.

*Cross-examined*—The symptoms of mania after the act, were his appearing naked, his flourishing the sword which he called

the sword of Washington, his not attempting to escape: these were the principal causes; there is a vague expression of the eye, nothing which I can mark particularly; from the manner in which he carries his head alone, it would not seem he was insane; his answers in relation to agriculture were correct; he made no foolish answers that I can remember: he answered on all subjects except on this act; he is not insane generally; it must be a *monomania*, or a delusion of some kind, or a case of *homicidal mania* proper, which is characterized by irresistible impulse. My impression is that there is some concealed delusion, that is a belief in the existence of an object which does not exist; a person may be under the influence of this delusion and be capable of judging of what is right and wrong; a person might believe in *spiritual knockings* and yet not be insane; that may not constitute insanity; that may be a delusion and yet not an insane delusion; in an insane delusion the senses will not correct them; a delusion might influence other subjects; his actions when Mrs. Phillips was in the house were evidences of insanity; the eccentricities which existed before the act were premonitory. If I saw this man in any place and he had not committed any act, and I had not been told of his being suspected of simulation, I should have pronounced him insane: I have seen him laugh and weep without apparent cause.

*Direct resumed*—The circumstance of his sitting on the bureau and his laughing and crying, showed a nervous state, or the initiatory symptom.

*Dr. David T. Brown sworn*—I am connected with the Bloomingdale lunatic asylum; have had about one thousand under my charge; if the testimony is true, and taking that in connection with my examination with Dr. Ranney, I am satisfied that he was insane at the time of the homicide, and is insane now; the manner of killing, his conduct after the act, his destroying the furniture, his conversation with the officer, his subsequent taciturnity, his general avoidance of reply in relation to the murder, his general deportment in his cell, are consistent with the supposition of insanity, and most of them inconsistent with his sanity. I believe him to be insane; I have seen three or four

acts of feigned insanity; I have no suspicion of its being feigned; they usually overact.

*Cross-examined*—His conversing freely with the officer is consistent with insanity; in his cell he answered few questions on the first days; the fact that he declined answering in relation to the homicide is consistent with sanity or insanity; there was one remark made in the cell by one of his counsel which I thought was very unlucky, as it might put him on his guard; I never saw a man who was entirely insane on every subject except an idiot; he may be rational on one subject; he is not a monomaniac; I think that some delusion exists upon his mind; that is only my supposition. A person can be sane on some subjects and insane on others; I think this delusion is something connected with his wife and children.

*Direct resumed*—The remark made by Mr. Hale left the impression which, if he was feigning insanity, might put him on his guard.

*By the Judge*—It is a common thing in insane asylums for an insane person to refrain from speaking of circumstances or acts which he has committed. I don't think he could simulate insanity without imitative talent of a high order, or a long and close observation of cases of insanity; his actions in court are most consistent with insanity.

The prisoner's counsel here produced a mortgage between George Lake and Joseph Potter for $150—recorded June, 1850.

*Dr. William Thomas sworn*—I have visited the prisoner within eight or ten days; visited him twice; we could get but little out of him; he talked but very little both times; I believe I have heard all the testimony; I think he was insane before the act, at the time of the act, and at the present time; when I asked him questions he would mutter.

*Cross-examined*—I think he is insane now, from his general course of behaviour; from his refusal to talk, and resistance to any questions which have been asked him; I judge that he was insane at the time of the act from the act itself and the general testimony of the witnesses; I had not made up my mind before

I heard the testimony; from the act itself I could not form an opinion.

*Egbert Carey sworn*—This witness corroborated the evidence of Elmore A. Vincent in relation to prisoner's strange conduct with a horse in May last.

*Henry Rikert, sheriff, sworn*—I saw prisoner when he was in jail before; don't know that I noticed anything in his conduct peculiar, with the exception of once; then I heard him crying in his room; asked what was the matter; he made some reply, don't recollect what; told him to make himself comfortable and we would use him well; he was shedding tears; have seen him often since and have spoken to him, but he hardly ever since gave me an answer; it made no difference whether I was alone or with company; for the last two or three weeks he appears more friendly; asked him one morning to give me his bone, meaning his hand: he gave me a bone which he had in his pocket and laughed as though he had done something smart; always speak to him when I go in; seldom get an answer; have always treated him kindly; have had no trouble with him; Ferguson had charge of him previous to our chaining him; have had no trouble with him since Ferguson left, except to push him in his cell when he came into the hall.

*Cross-examined*—Had no more trouble with him before Ferguson left than since; when we put the chain on him, he went three days without eating; after that he took his meals regular; he seemed angry when we put the chain on him; sometimes he appeared irritated, and at other times laughed when we forced him to his room; don't know but he slept well. One morning when he was down stairs I spoke to him and told him he had better go back; when we took him his breakfast he asked why he would not be allowed to stay down stairs; he said he would hurt no one, and would attend to his own business if we would leave him there, but if the boys in the lower hall did not want him there he would go up: I let him stay down all that day; it was several weeks after he was committed before we chained him.

*Robert G. Mooney sworn*—I have seen Lake frequently since

Lake *v.* The People.

he has been in jail, especially for the last six weeks; he has been rather surly, as a general thing he made no reply: I went in with Mr. Hale a number of times and he was treated as others; went in once when he appeared quite talkative; I remember Mr. Hale asking him if he should come in and see him alone; those who were in jail huddled around us. Mr. Hale said several times that he was his counsel and wished to assist him; he made no reply.

*Cross-examined*—He never told me that some person had told him how to act; I think he has generally taken his meals regularly; I suppose he has slept regularly.

*Direct resumed*—I can't say whether he has slept, or whether he has eat regularly.

*T. C. Campbell sworn*—Have visited the accused five or six times; have attempted to converse with him. The first time, I went in with Dr. Barnes; have talked with him, and he answered every question; we asked him if his arm was painful; he said it was and assigned the reason: don't recollect all the questions we put to him; asked him if he knew me; he said yes; never saw him when he was mute; he always answered every question put to him in my presence; don't remember of ever seeing the man before.

Here the defence was closed, when the following rebutting evidence was given in behalf of the prosecution:

*Alfred Van Vlack sworn*—Live at Union Vale; have known prisoner about six years; was present at his house on the seventh day of June last when he was arrested; heard Jonathan Moore say to Lake, " George, I want thee to come down and give thyself up like a man." George remarked, " Jonathan Moore, thee is a nice Quaker." Moore repeated the question he before asked, and added, if he would come down he would stand by him. George replied, " Yes, Jonathan, thee will stand by me and they all will stand by me." Lake was up stairs at a window; I think I heard him say, " I have committed murder; they lay there in front of the house and the first man that touches it I will kill." Don't think he cried; he appeared to be watching from one window to another; appeared to be walking

around; believe there were three windows in that part of the house; we went inside of the house; knocked up one of the boards in the upper floor; prisoner then walked backwards and forwards along this hole; once or twice run his sword down through; heard the report of a gun; looked up through the hole; he stood up in a leaning position. I then went in the room; he sat on the floor, his head leaning on his knee; he remarked, "Can it be possible it has come to this!" I remarked, "Yes, George, it has come to this." He was wounded; he arose and made one or two steps and fell down on the floor; he jumped up from the floor, took a circle around the room, fell partially against the wall, and let himself on the floor. I then took hold of him and with others took him out of the house. He made no resistance. He was laid on a bed; he dropped his under jaw down. I got water and washed him off; he did not get up. The next morning I remarked to him that his wife was not dead. He said, "How can that be?" I told him it was so. I think he then said, "I thought she was dead when I left her." I told him we were going to bury his children and asked him if he had any choice as to where we should put them. He said he had. Asked him where? He said he should like to have them buried where he was. He said that if he had got out he would have made a hole through some of us; that the old sword was a good one, and he could defend himself. He said he remembered he had executed a deed to his wife, and if the papers had been left where they were this would not have taken place. The conversation about the sword was next morning after the occurrence. I noticed nothing peculiar about his eyes; at times he would talk at random: have known him for about six years.

*Cross-examined*—I think the sword was a light horse sword. The blade was about eighteen inches long: it was an old one, and I think rusty. At times on that day he made a good deal of noise; sometimes he would halloo out loud, sometimes laugh; don't remember to have seen him dance; went there between twelve and one o'clock; between fifteen and twenty persons there: he was asked the question if he had given his wife a

Lake v. The People.

deed of the place; he said he had; the remarks he made about the deed were in answer to questions put to him; he sometimes hallooed when we talked to him; he made a hooting kind of noise; sometimes laughed loud while they were talking to him.

*William Van Vlack · sworn for prosecution*—Know prisoner; knew him about fifteen years; have seen him frequently during the last year; before this occurrence the last time I saw him was in jail about three or four weeks before; we spoke about getting bail; I proposed it. He said if I could get a person to go his bail he would take it as a great kindness. I discovered nothing irregular about him; nothing about the eye. The next conversation I had was upon his examination for this crime; saw him at his house; then he said, " There is Squire Van Vlack, justice of the peace." The examination was commenced in the afternoon and adjourned. After the witnesses were through I told him he might say what he wanted to without oath: he said he would tell all about it; he looked down about half a minute and then looked up and said, " No, I shall say nothing about it; I guess the least I say about it the better it will be for me." I noticed nothing peculiar in his appearance Know Catherine Johnson.

While this witness was on the stand the district attorney offered to introduce in evidence the record of conviction and imprisonment of Catherine Johnson for petit larceny in 1827. To the admission of this record defendant's counsel objected: · 1. Its antiquity; 2. Want of proof of the identity of the person so convicted with the witness Catherine Johnson. This objection was overruled by the court, and the record admitted in evidence, to which decision of the court defendant's counsel thereupon duly excepted.

*H. C. W. Watts sworn*—I am deputy clerk. The paper here produced was filed June 30, 1827; the paper shows that Catherine Johnson was convicted of petit larceny and committed to the county jail.

The district attorney then asked *William Van Vlack*, "Was she ever in the county jail?" To this question defendant's counsel objected as not being the best evidence, but the court over-

ruled the objection and allowed the question to be asked, to which decision of the court defendant's counsel duly excepted The witness then answered, "I think I saw Catherine Johnson locked up in the county jail."

*Cross-examined*—I know nothing about Mrs. Johnson's character except what I have heard; have heard her spoken of by her neighbors within the past year.

*Direct resumed*—Her general character is not good.

*Cross-examined*—Have heard my brother and his wife speak of her general character; don't remember of any one else. I live between two and three miles from her. From what I have heard my brother and his wife say, I should not place confidence in her: can't say as I should believe her under oath.

*Dr. John Cooper, Jr., sworn*—I have attended on Lake since he has been in jail: I have seen him four or five times. I have seen him in court: have conversed with him. I think he is sane now. I have heard a portion of the evidence; probably half of it; heard part of it yesterday. The counsel for the prosecution here asked this witness, "From the testimony, was the prisoner, in your opinion, sane or insane at the time he committed the homicide? To this question the defendant's counsel objected on the ground that the witness had not heard *all* the testimony.

The court then asked the witness the question, "Have you heard enough of the evidence to form an opinion?" This question was objected to by defendant's counsel, but was put by the court, to which defendant's counsel duly excepted. The witness then answered, "I think I have heard enough of the testimony to believe he was not insane when he committed the act." To the admission of which answer by the court defendant's counsel then and thereupon duly excepted. Witness then proceeded: "The day he arrived I asked him how he was injured; he said he was shot; I asked him who shot him. I forget whether he answered me or not; he said his arm pained him; I took the bandage off. The next day when I went in he did not answer questions so readily as the day before; I asked him if he felt easier; he said he did. I think he was not insane at the

time he committed the act; the first time I saw him I thought he was sane. When I heard of the crime I thought at first he must be insane to commit such an act."

*Cross-examined*—I read Levi Vincent's testimony. Think I heard part of his testimony; I form my opinion from what I have heard and read; I read it from the daily press.

The defendant's counsel here excepted to the testimony of this witness's opinion in regard to Lake's sanity at the time of the commission of the alleged murder, on the ground that it was partly formed from what he had read of the evidence.

The counsel for the defendant then offered to ask the following questions of this witness:

1. If a man should cut open the head of his wife, (or the woman he lived with and treated as his wife,) and child two years old, in the middle of the forenoon, and beat out the brains of another child four years old at the same time, thus killing his whole family and all within his reach, would that in your judgment furnish any evidence of insanity?

2. If at the same time he should destroy his clock, bureau, chairs, and most of the other furniture in his house with an axe or other like instrument, break out all the windows in the room where he was, destroy the window sashes and throw the bed and bed clothes out of doors, would you consider that any evidence of insanity?

3. If he should do all this in broad day light, and make no attempt to conceal the deed or escape, but should stay by the remains of those he had killed with a murderous weapon in his hand, what would that indicate?

4. If he should be found immediately after the deed at the scene of the slaughter, with no clothing on but a short cotton garment resembling a woman's night gown, in that condition should stand by an open window directly over the bodies of one of his children and its mother, whom he had killed, and should say when asked what he had been doing, " Go, see what I've been doing; I've been separating the black from the white," pointing to the dead bodies as he said it; what would that **indicate?**

5. If a short time after this, the same day, he should be seen singing and dancing in the same room, in the same condition as to clothing, laughing boisterously and crying alternately all the while, making a great noise, and should come to the window with a sword in his hand and say in a loud voice, "This is the sword of Washington, all who are in the right way shall be saved, and those who are not shall perish, or words to that effect, what would that indicate?

6. If while he was conducting himself in the manner indicated in these inquiries he should be shot, and after bleeding profusely should appear more calm and rational, and on being arrested immediately afterwards, should confess the murder and state particularly how he killed each member of the family, would this induce you to change your opinion?

7. If on the day of his arrest an officer in attendance upon him should ask him if he hadn't given his wife (or the woman he lived with as his wife) a deed of the homestead, (a place worth $200 or $300,) and if he didn't want her to give it up to him, and if she didn't refuse and if that wasn't the reason he killed her, and he should say it was, and should add on being asked why he killed the children, that since he'd begun the job he thought he'd finish the breed, or words to that effect, what would that be indicative of?

8. If the night before the killing, his conduct was so strange and unusual that his family became alarmed, and complained of his being crazy to the neighbors, would this circumstance tend to confirm you in your opinion?

9. If he had been seen by his neighbors on different occasions a week or two before the murder, driving his horse and wagon round in a circle without any apparent motive, what would this, taken in connection with the other circumstances, indicate?

10. If while confined in jail under indictment for murder, he should generally persist in keeping silent, refusing to communicate with his counsel, though repeatedly and earnestly urged to do so, and on the few occasions that he spoke at all should talk incoherently, speak of himself in the third person, be apparently unconscious of his situation and unaffected by any

remarks on the nature of his crime or descriptive of it, laughing and crying alternately without any apparent cause, as if unable to control his feelings, what would that indicate?

11. If his general appearance and conduct at the time of the murder were such as is indicated by these inquiries, have you any doubt he was insane?

12. Have you any doubt he was so insane as not to know he was doing wrong?

13. Have you any idea he could have feigned it all?

14. If he had been feigning it, would he not have been very likely to have continued feigning, after he was shot?

15. Is not the circumstance of his appearing more calm and rational after he was shot and bled so freely, a rather conclusive proof that his previous conduct was *unfeigned?*

16. If he had a motive or supposed he had, however inadequate, was not the fact of his shedding more blood than was necessary to accomplish his object, in other words, killing all within his reach, one of the strongest characteristics of insanity?

17. If feigned, would not his conduct in his cell be uniform?

Each and every of the questions above stated, offered by the defendant's counsel to be asked of this witness, were by the court excluded, to which decision of the court upon each and every of the questions above stated, defendant's counsel duly excepted.

Witness proceeded—I heard a portion of the testimony of Mrs. Phillips; I heard the testimony of his laughing and crying the night before; heard of his sitting on the bureau; alternate laughing and crying are symptoms of insanity; have been in practice nearly five years; have had some experience in treating insane persons; have had from twenty to thirty at a time under my charge at the county House for the last three years.

*John B. Oakley sworn*—I have known Lake about four years; saw him the day before this occurrence; he was at his house. I had some papers to serve on him. Am a constable; had previously served papers on him in the same suit. Hubbard Duncan was with me. Lake was in the upper room looking out of the window. I told him I would like to have him come down,

as I had some business with him. He asked me what it was. I told him I had an assignment I wanted him to put his name to; he said he believed he would not put his name to any papers. I said if he would not put his name to that paper, I had another to serve on him. I then commenced to read, and he began to make a noise; I stopped reading for a moment, till he got still: he made a sort of laughing noise. I then read the paper through, and told him I had a copy to leave with him; he told me he would like to see me get to him; I then went away; the last time I saw him before that, he was in a hovel skinning a cow. This was about four weeks before I called to serve the papers. I saw him at Verbank the day after I was there the first time; I saw him once after this before I served the papers the last time.

*Cross-examined*—He was driving; his wife was with him; she had one rein and he the other. I saw him and served the paper. He made a sort of blowing noise: he stamped with both feet. I told Duncan we might as well go away. Lake said "Yes, there are plenty of roads." He spit at me when I started to go away.

*Direct resumed*—He commenced his noise when I commenced reading; he stopped after I did and commenced again when I commenced to read

*Joseph Potter sworn*—I live at Lagrange; have known Lake ten or twelve years. I am the Joseph Potter spoken of in the mortgage in evidence; saw the prisoner in jail after this occurrence; I had a mortgage against his real estate; also one against his personal property. I told him I wanted something done about the matter; he said I could do as I pleased. I asked him if I had not better go on and sell; he said he did not know but what I had; I told him that if I sold the whole there would be a balance, and asked him what I should do with it; he said pay his debts so far as it would go. I sold all the personal property covered by my mortgage; there yet remains due some sixty dollars.

*Cross-examined*—Was not at the prisoner's house on the day of the murder.

*W. Vincent sworn*—I was at Lake's house about three o'clock on the day of the occurrence. I did not hear Lake say, " All those who are in the right shall be saved and those who are not shall perish." I saw Levi Vincent have a hammer in his hand; I heard Jonathan Moore talking with Lake; I saw Lake after he was brought in the house after he was arrested. I asked him what made him kill his wife; he said if she had given up the papers there would have been no trouble. I know Catherine Johnson; I have heard her general character spoken of as bad; I don't know as I can name any one who has spoken of it.

*George Bostwick recalled*—I am an officer attending court; after we got the prisoner in his cell yesterday, he said, " You had a nice time of it, didn't you?" I told him he had not ought to have acted so; it would not help his case; he said he thought it would. After I left him he spoke to me and said he wished me good luck; he made a good deal of resistance when we were taking him to his cell and tried to trip me up.

*Cross-examined*—He tried to trip me up several times; his hands were fast; he made an effort to-day to trip me down.

*Dr. Samuel Dodge recalled*—Was in Lake's cell once since the trial; have known him several years; visited his family; noticed him in court and believe him sane; I personally know him enough to form an opinion; I think prisoner sane. The counsel for the prosecution then asked this witness whether from the testimony he regarded the prisoner sane or insane at the time of the commission of the offence? To this question defendant's counsel objected, because witness had not heard all the testimony, but the question was admitted, and defendant's counsel duly excepted. The witness then answered, " I think he has feigned insanity; think he was sane when he committed the crime; he might have been mad.

*Cross-examined*—The idea of insanity I have is an aberration of the mind. The general symptoms of insanity are different; sometimes they are still, sometimes noisy: if he had been insane at the time he committed this offence, he would tell of it now, tninking he had done his duty; if he was insane then he would talk about the crime now as much as upon other subjects. The

ataxy of his pulse is something of a test as is an odor so pecu-
liar to insane persons; this is not of itself a test.   I don't think
the fact stated in Mr. Moor's testimony an evidence of insanity,
as it might be feigning.   There is a difficulty in detecting
feigned insanity.   Defendant's counsel asked this witness the
following questions:

Is the fact that the prisoner is at one time silent, refusing to
speak for a long time, and then becomes communicative for a
while, any evidence of insanity?   This question was objected
to by the counsel for the prosecution, and excluded by the
court, to which exclusion defendant's counsel thereupon duly
excepted.

*Dr. John Thorn affirmed*—Am a physician; know Lake; saw
him first at Verbank on a trial; examined him then; have seen
him three times since the murder; have seen him in court; have
watched him pretty closely.   I think him sane; have heard all
the testimony since *Levi Vincent* was recalled; have formed an
opinion as to his insanity at the time of the tragedy.   Have
made up my mind that he was *sane* at the time he committed
the act.

*Cross-examined*—Have had experience in treating insane per-
sons.   The appearance of the prisoner the night before the
occurrence is not in my opinion a symptom of insanity.   The
killing of all within his power is not of *itself* a symptom of
insanity; it is not a very easy matter for a man in Lake's con-
dition in life to imitate insanity; think he might deceive a man
of the experience of Dr. Ranney; a man remaining on the
ground and conducting himself as Lake did, is not of itself an
indication of insanity; have heard and read of the rifle and
furniture being damaged, the window smashed out, &c.   On his
cross-examination, the counsel for the defendant asked this wit-
ness the following question:   Do sane persons kill without a
motive?   To this question the district attorney objected, and
his objection was sustained by the court, to which defendant's
counsel duly excepted.

This witness was then asked by the court, " Do you think
the conduct of Lake, as described by the witnesses, an evidence

of insanity? To this question defendant's counsel objected, on the ground that this witness had not heard all the evidence as to Lake's conduct, but the objection was overruled, and the question asked, to which defendant's counsel duly excepted. The witness then answered that he did not. This witness further said, on his cross-examination, " I consider the fact of the prisoner trying to defend himself an evidence of sanity; consider the fact of his stabbing his sword through the floor an evidence of sanity."

*Edward Horton sworn*—I have seen Lake in jail; saw him play cards in there; he has done so off and on for five weeks; he can count game as well and as good as any one else; have seen him do so a great many times; he understands the game and is a pretty good player; he has beat me as often as I have beat him; this took place in his cell When he was playing he would talk about the game: he first asked if there were any cards in the jail. I told him I thought there were; he said he should like to have a game: we played seven up. I was in jail at that time; was there about five weeks. Lake was not out in the hall but a few times. Charles Harvey, James Horton, and myself were there; he would talk and laugh; never saw him cry but once, and that was when Mr. Hale and two doctors were there: never said anything to him about his trial; never heard anybody talk to him about anything but cards; don't recollect of telling any person of this. Talked to Mr. Campbell about this subject about fifteen minutes ago.

*Mrs. Elizabeth Harvey sworn*—I have been in jail a few days past; my husband is there; I came down to see him; his name is Charles E. Harvey; I saw prisoner while I was there; I saw him playing cards with one of the other prisoners. They called him Jerry; it was in a cell, but not in the one the prisoner occupies; heard Lake say something about the cards; never saw it but once; I came here a week ago; I think they were playing Saturday afternoon.

*Cross-examined*—There was something said about the cards; George said something, about the cards; I saw Lake last July; he did not say anything; the sheriff told me it was Lake; I

heard other prisoners talk to him; can't recollect his replies; I have told Mr. Mooney what I have heard said to Lake; when I saw George playing cards, my husband was in the cell; I had nothing to do with the game.

*Jacob C. Ferguson sworn*—I live in Poughkeepsie; I was jailer up to the 18th of August; was jailer both times Lake was brought in; I recollect the time of Lake crying: he undertook to come out of the lower door, and I put him back up stairs; I asked him if somebody had not been putting him up to go out; he said he had been told that I had no right to keep him there; that I was only playing the fool with him; he ate pretty regular except when he got mad at us, and one time he went without eating two days; I don't know anything about his sleeping. I was there when an affidavit was read to him in relation to putting off his trial; William Wilkinson was there, and George H. Tompkins; Mr. Wilkinson read over the affidavit and he did not understand it; then Mr. Tompkins read off the affidavit; he read over a clause and asked if it was right; so he read one or two; he read another one; and George said he did not know about that, but his lawyer ought to know; the next clause he said he did not know about; after an explanation he assented to it; he went through the affidavit that way; he then went to the window and made his mark to it; I wrote his name and he made his mark; the clerk then administered the oath; he did sometimes refuse to talk to his counsel: the first time Mr. Wilkinson went up George did not speak to him; I told George that Mr. Wilkinson wanted to defend him and he ought to talk to him; Mr. Wilkinson went up and he talked a little to him; Mr. Wilkinson said he wanted to talk alone with him; I went out.

*Cross-examined*—I went up with Mr. Hale; I made an effort to induce him to talk; he would not; he went in several times and could not get him to talk; I told him Mr. Hale was assigned as his counsel; we made repeated attempts to get him to talk but could not succeed; I think I have heard him speak to Mr. Wilkinson once before the affidavit was made, I think a day or two, it might have been the same day; I think Mr. Wilkinson

Lake *v.* The People.

said he came to talk about the trial; Mr. Wilkinson said he did not want anything said about what he said to George. I don't recollect any reply that George made; I think he did not reply, I am not positive. Mr. Tompkins read the affidavit and explained what the words meant, he said the defendant meant him; I can't recollect anything else; when Mr. Tompkins read over a portion of it he said, " is that so, George?" I think he said yes, there was one clause he said he did not know about exactly; several times he would abstain from eating; once he did not eat for four days, sometimes two or three days; I think I was a jailer until the 18th of August, I left because the sheriff and I did not exactly agree.

*By the Judge*—He stopped eating for a spell when we chained him; he went without eating once before.

*Cross-examined*—One day I asked him if he did not want his pantaloons on; I took the chains off so he could put them on, he made a dive for the door but I held him; I punished him; 1 struck him with my clenched fist in the side and on the arm; he said, don't strike me, I will behave.

*Dr. Peter Barnes sworn*—Saw prisoner the day he was brought to jail; examined him in his cell, thought he was sane; think so yet; think he is sane at the present time; did not see him from the time he was put in jail till to-day.

*By the Court*—He seems to know what is going on; should think if he was insane he would not understand as well as he appears to.

*Dr. Perlee Pine sworn*—Saw prisoner first the day he was brought to jail, have seen him in his cell twice, examined him the first time with the intention of standing by him at his trial, can't call him insane now; think him sane now; when I first saw him he was asleep; when he first waked up I thought I saw something in his eye that betrayed insanity, but afterwards thought it was as usual; think he is a sane man now. I have heard all the testimony except that given yesterday morning, and taking all the testimony and my examination into consideration, I should not think he was insane at the time he committed the crime. I think he was sufficiently sane then to

know what he was about; have had some experience in treating insane persons: have from twenty to thirty insane persons under my charge at the county house.

To this evidence defendant's counsel duly excepted, on the ground that witness had not heard all the testimony.

*Cross-examined*—The circumstances of his appearance after committing the crime are in my opinion of themselves evidence of his insanity; the symptoms of insanity are a deranged intellect; don't think the absence of the appetite is of itself a symptom of insanity; the absence of sleep is not in my opinion an indication of insanity; alternate laughing and crying are not in my opinion evidence of insanity; don't think the circumstance of the prisoner's flourishing his sword a symptom of insanity. Last Saturday I had a conversation with Lake all alone in his cell; he then appeared as sane as any other person. I have noticed the prisoner appears to notice as much as any one. I distinguish a sane from an insane man by his not being insane.

*Dr. L. H. Allen sworn*—Reside at Owego; have been a physician since 1820: saw Lake first last Monday afternoon; examined him yesterday; think it a case of simulated insanity at the present time; think so from a combination of circumstances; first noticed his being removed from the court; noticed his appearance in his cell; his general deportment, the absence of some characteristics of acute mania. Upon these things I formed my opinion. I found a disinclination to be removed; the characteristic of acute mania is a disregard of self.

Cross-examined: Have no extensive experience with cases of insanity; had my attention called to the subject by having a case similar to prisoner's; trial commenced the 8th of August; it was the case of Thurston; was witness for defendant. On the last trial he was acquitted on the ground of insanity; don't know as the indications of feigned insanity have been brought within any general forms. The indications of insanity are various; the symptoms of *homicidal mania* are an inclination or desire to commit an injury on some persons without any assignable cause; should consider the killing of one person by

Lake v. The People.

another without any motive as prima facie evidence of insanity; it would suggest to the mind of the medical man the idea of insanity; one of the most reliable symptoms of insanity is watchfulness and sleeplessness; these are difficult to be feigned and are very reliable; sometimes insane persons will refuse to eat; there is a sort of consistency in the acts of an insane person; should expect from simulated insanity a change in the conduct; should think a person feigning insanity would endeavor to appear the same before the same person at different times if he could remember to do so; persons feigning insanity are very likely to overact; a person in some forms of insanity, as of a melancholy character, is apt to choose his victims from his friends.

*Direct resumed*—I had a conversation with the prisoner in jail yesterday; I endeavored to draw him out into a conversation; sometimes he would answer me; he said he was once acquainted with Mrs. Johnson; I said " she rather slandered you, didn't she; she thought you was crazy.; he replied, " she has a pretty good head on her shoulders if she would only keep it straight;" my brother was in there with me; he did not know who we were.

*Cross-examined*—Have seen the prisoner only once, that was yesterday.

*Dr. E. W. Tallman sworn*—Have known prisoner about 18 months; have visited professionally in his family at the confinement of his wife; have seen him fix watches and clocks at his house; conversed with him some; he is intelligent for the name; have examined to see as to his condition; can't help but think he is sane; have heard most all the testimony; from the testimony and my knowledge of the man I think he was sane when he committed the act.

*Cross-examined*—Have seen Lake in prison four times; saw him in prison this morning; there is no satisfactory evidence to me that he was insane when he committed the act.

*Dr. J. Cooper, sworn*—Have been a practicing physician since 1807; have never examined prisoner; have seen him in court to-day, yesterday and the day before; believe him sane now, heard most of the evidence.

Defendant's counsel here objected to the opinion of this witness, on the ground that he had not heard all the testimony, but the objection was overruled by the court, to which defendant's counsel then duly excepted.

The witness then proceeded to state: In my judgment he was sane when he committed the act, I am satisfied that when he came to prison he was not insane; have no doubt he is sane; have not seen a more intelligent eye in court; believe he knows perfectly well what he is about; his turning around the wagon is in my view rather an evidence of insanity; his tearing up the furniture is in my view a premeditated act to intimidate his wife and make her give up the property; the killing of his two children was a strange act, but having commenced the operation he probably thought he would finish.

*Cross-examined*—I consider his whole action as a feigned insanity; his actions on the road were strong indications of insanity; it is not often that a state of insanity comes on at once; I think the property was destroyed to induce the woman to give up the paper.

The prosecution here rested.

The counsel for the defendant then called *Cyrus Perkins* as a witness, who testified that he went to the prisoner's house at about one o'clock on the afternoon of the 7th of June. When I came in sight of the house I saw him throwing something white out of the window.

I saw a chair or two and a piece of stove pipe out doors; when I first saw him he was in the upper room with his sword in his hand; I went down to the gate; called him by name and asked him what he was doing; he replied, " you see what I have been doing;" pointed down to the bodies and said " I've been separating the black from the white;" the windows and the window sashes were broken out; the clock case looked as if struck with something; the drawers were banged to pieces with something; I should judge it was a dull axe. The work bench was marked like the rest; think the windows were broken; the stove pipe was down.

*William Wilkinson sworn*—Lake, the accused never said a

Lake *v.* The People.

word to me neither before or after the time the affidavit was made, in reply to a question from me; he has never given me a word in answer to a question from me; I read the affidavit to him, but he made no response; am positive he did not say "yes," to a question from Mr. Tompkins.

*Cross-examined*—I brought the affidavit into court and read it as his affidavit.

Afterwards, the counsel for eth defence having rested, the court charged the jury as follows:

Gentlemen of the jury—You will doubtless approach the examination of this case with a due sense of its importance and of the responsibility resting upon you. The prisoner at the bar is charged with the violation of a law by the provisions of which his life has become forfeited. You stand between him and that offended law. If he is innocent, you must protect him from its demands; if he is guilty, you are required by your duty and by the sacredness of your oaths, to pronounce him so and deliver him up to that just punishment which his crimes call for and the legislature have prescribed.

It is frequently a difficult question in cases of homicide to determine who or what caused the death. But in the present case we are not embarrassed with any doubts on this subject. The proof is clear and undisputed both from the testimony of an eye witness and the prisoner's own declarations, that he caused the death in question.

We therefore turn at once to a consideration of the defence, and in doing so we are to lay aside every prejudice, throw off every feeling of partiality or hostility, disregard every symptom of public opinion and lay aside every influence and consideration except such as arise fairly and legitimately from the testimony before us.

The burthen of the defence of insanity rests upon the accused. Every man is presumed to be *sane;* he is supposed to know what he is about, and to *intend* every thing that he does, and is held responsible for his every act.

This presumption must therefore be overcome by proof estaablishing the existence of a different state.

The evidence in the present case naturally divides itself and will accordingly be considered under the following heads:

1. The nature of the act. 2. The degree of motive. 3. Scientific opinion. 4. Conduct of the prisoner.

Touching the first point I have but little to say. It is contended that the fact of the prisoner killing the woman with whom he cohabited and his own children, is, in itself evidence of insanity. This argument evinces not only a want of knowlenge of human nature and of the springs of human action, but the grossest ignorance of the history of mankind. For, from the time Cain slew his brother, down to this day, when almost every newspaper brings tidings of a wife killed by her husband, or children by their parents, all experience shows that no ties, however strong, no relation however sacred, not even the bonds of affinity and consanguinity could withstand the wrath of an exasperated man; and indeed when carefully and closely considered, the domestic relationship, so far from being a barrier against violence, invites to its commission, by the opportunity it offers and the helplessness of a portion of its inmates. Those who are constantly together have such abundant means of discovering the offensive traits in each other's disposition, that love not unfrequently degenerates into hatred and the intimacy of the family circle, which should lead to peace and happiness, too often furnishes the occasion for angry irritations and collisions which ultimately terminate in violence and bloodshed. And when we consider in addition to this, the numerous evil minded persons, their ungoverned passions, the artificial excitements to which they resort, we can hardly be surprised that a very large portion of the homicides occur amongst those who are connected by the ties of family or of blood. Indeed, it is well known historically, that infanticide or the murder of one's own children is the prevalent crime in some countries, and there is too much reason to believe that it is too frequent in this. Perhaps my views may be colored by personal observation.

The last case of murder tried in this court room was that of

Lake *v*. The People.

a woman for poisoning her husband; the other one, tried at the same court, was that of a man for killing the child of his wife. Both of them were executed in July of last year.

In June last a man was tried before me in Brooklyn for beating his wife to death, and in December of the year before last, a man was tried before me in Brooklyn, who stabbed his wife, his mother and her sister, all the persons present. The wife and mother were killed on the spot; the sister, though dangerously wounded, survived to tell the story on the witness's stand. It was done in broad daylight, and the culprit immediately walked out of the house and surrendered himself up, declaring his readiness to suffer the penalty of his crimes. No insanity appeared in the case, and he was executed in January, 1852.

To say, therefore, that a man will not kill his relations unless he is insane, is equivalent to saying that he will not *commit crime* unless he is insane; or in other words, that there is no such thing as crime, inasmuch as its wickedness proves its innocency; it is hardly necessary to add that such a doctrine is subversive of all order and safety, and does away with the whole administration of criminal justice, and is just worthy of the source whence it originated, namely, among French infidels and German metaphysicians and transcendentalists.

2. A *motive* for the killing is sometimes an important if not an essential point on a trial for murder. But those are cases where the evidence of *the killing* is *circumstantial*. Then it is important to show that the prisoner had a motive, with a view to establishing that he is the person who committed the act. But in cases where, as in this, the killing is undisputed, the question of motive becomes less important. For, the moving cause is often not very apparent; in very many cases of homicide there is no motive discoverable, except what arises at or near the time of the act. Excited passions, or a desire for vengeance for a real or imaginary insult or wrong, not unfrequently lead to the crime.

If a case should arise where it was *absolutely certain* that there was *no motive* whatever for the commission of the crime,

it would undoubtedly tend to show insanity, for insane persons are the only ones that act without motives. But who can say there is no motive? Who can fathom the mind of the accused and ascertain that there is no hidden desire of vengeance, no envy, or avaricious passion to be gratified?

There is no rule of law which determines what is an *adequate* motive, even where it is necessary to show one: One man will kill another to obtain $1,000; another may do the same for a tenth, or even a hundredth part of that sum; in each case it is adequate in one sense for the mind on which it operates. But, in truth, and in another sense, no amount is fairly adequate to induce a reasonable man to take the life of another; nothing will induce a reasonable man to commit murder; it is idle to talk therefore about an adequate motive for a reasonable man. (*See* 1 *Beck,* 794.)

What motive appears in the present case? The motive said to be assigned by the prisoner himself is, the desire on his part to obtain certain papers or title, which the woman refused to deliver up. The theory of the prosecution is that there was a controversy, a bone of contention touching the title to the place, which furnished the basis of disagreement, quarrels, exasperation, and finally personal violence. If this be so it would undoubtedly have a tendency to show a motive such as may be fairly supposed to have induced the act. For slight causes of contest, however unreasonable or unjust, may be made the ground work of irritations, which may be wrought up by the untoward circumstances between irascible dispositions. until one of them may reach the point of *uncontrollable* passion, or in other words, the *killing point.* It is for you to determine whether this theory of the prosecution is sustained by the evidence

But it is contended by the defence, that even admitting a sufficient motive as to the woman, there could not be any occasion for destroying the children. It is undoubtedly contrary to the general course of nature for a man to murder inoffensive children, and especially when they are his own. But there is another principle recognized as pertaining also to human na

Lake v. The People.

ture; and that is, that hatred for the parent is often extended to and visited upon the offspring, and the same ungovernable rage that would destroy the mother, might impel the offender also to involve her descendants in the common ruin; upon the principle that they were a part and portion of the detested mother, or, as the prisoner expressed it, "as he had commenced the job, he thought he would finish the breed."

3. We now come to consider more directly the question of *insanity* at the time of the occurrence as it stands upon the *scientific testimony.*

The determination of this question is often attended with great difficulties. The precise state of a man's mind can not be easily ascertained, and especially is it difficult to discover whether alleged insanity is *real* or *feigned.*

The principal evidence in such cases must, of course, be the conduct of the prisoner himself.

The law however authorizes the admission of the opinion of *experts,* which includes medical men, and those who have particular care of the insane, and therefore are supposed to be more competent to judge of such matters than ordinary men.

These opinions are not always the most satisfactory. They depend for their value partly upon the skill and experience of the witness and partly upon the opportunities which he has possessed of observing the prisoner's conduct. A skillful man who has full opportunity to see the parties for a long period, can, probably, in most cases, ascertain with considerable accuracy whether the case is real or simulated insanity; but a mere occasional observation for a few moments may leave the most learned man in doubt or even deceived.

The reason of this uncertainty is, that there are no general, infallible indications of insanity. It assumes so many forms and aspects, that no *general* rules can be laid down for its detection.

The opinions depend also for their influence, as evidence, upon the *reasons* which the physicians give as their foundation. For, if a witness gives you an opinion and accompanies it with a reason which in your judgment is *unsound,* you will be justified in holding the opinion unsound.

Lake *v.* The People.

It is hardly necessary to add that these opinions do not carry with them any binding authority. They are mere evidence to be weighed, and are often testimony of the *slightest* character and weight. You perceive that the doctors differ totally in their views as to this man's testimony; and while one tells us that his refusal to talk freely about the homicide is proof of insanity, another tells us that the care and caution which he thus evinces, convinces him that it is a case of *simulation*. In this connection I will read an extract from an English author touching the examination of medical men, which may perhaps throw some light upon Dr. Pine's testimony. (*Winslow*, 75, 76.)

The same remarks are applicable to the books which are read. They are not *authorities* in the legal acceptation of that term; they are treatises written by men professing to understand certain subjects, upon which they choose to write certain books. It is perhaps doubtful how much credit is due, without any evidence of the standing and skill of the author. That they are not all *correct*, is quite apparent, for the reason that they conflict with each other, just about as much as the doctors do when they are called as witnesses. Indeed, there is no reason why we should expect those who write essays for pleasure or profit, should be confined any more strictly to the truth, or be found any more uniform and consistent, than if they were under the obligations of an oath.

It is proper here to observe that every aberration of mind is not such an insanity as protects a prisoner from responsibility. I had occasion to examine the subject in the case of Wesley Pine, who was tried here in April, 1848, and will read a portion of the charge delivered on that occasion. (2 *Barb. Sup. Ct. Rep.* 570, 572.)

4. The principal testimony is that arising from the prisoner's *conduct*, comprising his words and actions. It has been laid before you fully in all its details. The counsel on both sides have had full scope to prove all that he did or said at the time of the occurrence, as well as before and since. You will take up this evidence and examine it carefully and bring to bear upon it all

Lake *v.* The People.

your experience and knowledge of human nature and of the motives and sources of human actions.

It seems to be conceded that up to a short time before the seventh of June, he was a man of sound mind, attended to his ordinary business, took care of his family and passed for a rational man.

It is always a circumstance of some suspicion when this defence is set up, if it appears that no insanity *existed until the time of the killing.* For it will not do to allow a man to go at large and pass for a sane man in community, and be capable of dealing with his fellow men, and yet the moment he commits an outrage upon society, permit him to throw off his legal responsibility, without clear and satisfactory evidence that such change is *real* and involuntary.

I will now advert briefly to the prominent features of the case without however detaining you by recapitulating the details of the testimony.

1. The first marked instance of eccentricity occurred some weeks before the seventh of June, and was seen by several witnesses: I allude to his turning around in the road at the time when he and his wife and child were riding.

This is certainly unusual conduct. It is altogether out of the ordinary course and shows something wrong and irregular.

Two theories are set up by the respective counsel, to which they respectively claim that this conduct conforms.

The prisoner's counsel claims that it can be reconciled only with mental derangement. The prosecution on the other hand adopts the solution given by Dr. Cooper yesterday, that it was done designedly and with an intention to affect or operate upon his wife.

2. Another occurrence is spoken of by Mrs. Johnson, who tells us of his walking on the stoop on Monday, the day before the occurrence, putting his hands on his head, crying out loudly and weeping on his wife's neck; the natural inference to be drawn from such a fact alone is undoubtedly that the man was laboring under some violent pain or mental disorder. It is however to be observed that she was present and did not seem to care

much about it, nor in fact to pay much attention to it. The witness describes her as *sitting on the door step engaged in sewing.*

How is this conduct of *both* to be explained? How do you account for the apparent indifference of the woman? Would she have been thus unmoved if she had supposed him really insane? Or was she aware he was merely playing off a scheme upon her to frighten her or bring her into his measures on the subject of the deed or any other? It is for you to determine. It is undoubtedly a circumstance of some moment, that nearly or quite all of his eccentric movements were made in the presence of his wife, and no one seems to have discovered anything extraordinary in his deportment when he was alone or absent from her.

3. His conduct on Monday afternoon, when Mrs. Phillips was present. He was then evidently much disordered; he refused to talk or answer questions, but sat on the bureau laughing or crying, talking occasionally to himself: the woman seemed then to be alarmed, but still her fears do not seem to have reached a height sufficient to induce her to seek protection from others, or shelter elsewhere. Others, however, were greatly alarmed, as they state. Mrs. Johnson hastened away, and one of the men speaks of getting over the fence to avoid him. Why did not her fears take an equally tangible shape? Was it because she was a woman of great fearlessness? or, was it because she understood the matter better than the rest of them, and knew that it was all simulated? It is for you to say.

4. The next in order are the circumstances discovered after the killing. The prisoner was found in the second story of the house, standing at the window, the sash being broken out, with no clothes except a white night gown, flourishing a sword and calling it the sword of Washington, making a great noise, laughing, singing and dancing as one of the witnesses states. All this is clearly inconsistent with a sober, steady, well disposed man. But it is for you to say whether they are evidences of insanity; or do they look like an overacted attempt to appear insane? is he not rather *too* crazy? are not the circumstances

Lake *v*. The People.

rather exaggerated? do they not evince rather too much prepa-
ration and effort to produce effect?

It is true that when a man who commits an injury *flees* and
attempts to escape, it is strong evidence that he is guilty, that
he is *conscious* of having *done wrong*, and therefore it repels the
idea of irresponsible insanity.

But it does not therefore follow that *omitting to escape* is
conclusive proof of insanity. Because at this day when this
sort of defence is set up so frequently, the whole community
become unfortunately impressed with the notion, that this de-
fence is to be relied on whenever a great crime has been com-
mitted and all other defences fail; and it is not to be deemed
matter of surprise that a man who has suffered his passions to
lead him to the crime of murder would immediately begin to
prepare himself for such a defence by endeavoring to sustain
the character of a madman. Nor when the chances of escape
by fleeing or by standing trial on such a plea are compared, is
it certain that the prisoner, if sane, did not make the wisest
choice. But let us look at the testimony a little more closely;
it is highly *important*. The conduct of the prisoner immedi-
ately after the killing is particularly calculated to throw light
on the subject; it is not a pure question of *science*, it is rather a
question of *common sense*, which the jury is supposed to possess
in quite as high degree as professional gentlemen. The theory
of the defence is that he was not *conscious* of doing wrong when
he killed this woman and children, and to that extent the in-
sanity must go to shield him from responsibility. Now what is
the natural consequence of the doctrine? Why, if he did not
know he had done wrong he would not flee, nor have any rea-
son to prevent others approaching him. How does this com-
pare with his deportment? Did he permit others to approach
him and act as if he supposed nothing wrong had occurred? Or
did he assume an attitude of defence? Was his conduct calcu-
lated to *intimidate* and *terrify* those who came to arrest him?
It did so, as they show. Why did he get up stairs and place
himself in the window, brandish his sword, advise them to go
away, speak of having fire arms and refuse to come down, ex-

cept he was influenced by a consciousness of having committed crime, and that the others had come to arrest and punish him? How is it to be explained? Can it be?

It is true that the rifle was thrown away, but whether it was owing to the fact of its being useless for want of ammunition does not appear. It is contended that he was under a *homicidal impulse* which impelled him to kill all within his reach. But he did not rush among the crowd that surrounded the house and cut right and left as maniacs sometimes do: he seemed quite satisfied to let them alone if they would keep away from him.

5. His conduct in prison, his general taciturnity, refusing to talk to his counsel, and resistance of the officers and such facts of which there are several, have all been laid before you. The doctors have passed upon it and differ entirely as to their construction of the testimony; you will look into the matter and determine which are right.

6. It may be proper to advert to one or two pieces of testimony which, the prosecution claims, show sanity.

The communication made by him to officer Townsend while in custody, and the fact spoken of by him that the prisoner conversed freely until he was consigned to jail.

7. You also have the fact that he is in the habit of playing cards in prison.

You will consider these circumstances and say whether they are or are not reconcilable with the theory of this defence.

8. Something has been said about the affidavit made by the prisoner to put off this cause. The matter has been spoken of, probably without intention, as if the court had exacted an unusual thing from this man. The truth is simply this: When brought into court he would not speak nor pay any attention to the proceedings of the court. The counsel asked to have the trial put over. The court refused to put it off without the usual affidavit, for the reason that if the man was *insane* no trial could be had, and therefore there was no propriety in sending the case to another court and requiring the district attorney to bring all his witnesses here again: this decision brought out as we supposed it would the affidavit in question

Many irrelevant matters have been brought into this case which it is hardly necessary to notice.

It has been asserted by counsel that the plea of insanity has never prevailed in any case where the prisoner has not turned out afterwards to continue insane. I do not agree with the counsel on this point; but I content myself with merely saying that it has nothing to do with the case.

Much has also been said touching the supposed illegal conviction of the colored man Freeman. I have never seen anything to lead me to the conclusion that that conviction was not well founded and correct, so far as the merits and facts were concerned.

It is true that Dr. Brigham and others were of the opinion that he was insane and so testified on the trial. It is also true that on a post mortem examination 18 months after the murder Dr. Brigham and other physicians were of the opinion that the brain was diseased, so as to produce insanity. But they were not unanimous on this point. I believe moreover a diseased brain in August, 1847, did not necessarily prove insanity in March, 1846. So that I do not discover any good grounds to question that the juries who decided him to be sane at the time of the murder were fully warranted in so doing.

But whether that verdict was correct or not, is not material in this case. We are trying Lake and not Freeman.

I wish further to add that the remarks I have made on the testimony in this case are not *binding* upon you; you are to decide the question of fact uninfluenced by any supposed opinions of the court. I have made such remarks as I considered appropriate to the discharge of my duty in pursuance of the laws of the land. The question of the duty of the court in such cases was submitted to the fifteen judges of England a few years ago, when they returned the following answer. (*The judge here read from 1 Beck. Med. Jur. 772.*)

You will now take this case to your room and carefully weigh and examine the testimony, bringing to the subject an honest and sincere desire to ascertain the truth. If the evidence *satisfies* your minds that the prisoner is guilty, you must say so by

your *verdict* of guilty. If however it leaves upon your minds a reasonable doubt, you must give him the benefit of the doubt by an acquittal.

To which charge and every part and portion thereof defendant's counsel duly excepted. Defendant's counsel thereupon, and before the issue was submitted to the jury, requested the court to instruct the jury.

1. That the testimony of Washington G. Vincent and William Van Vlack in regard to the general character of Catherine Johnson, does not impeach nor tend to impeach that witness, not being followed by testimony as to her .character for *truth,* or her credibility under oath.

2. That the record of a conviction of Catherine Johnson for petit larceny twenty-six years ago does not affect her present credibility.

3. That the testimony of Levi Vincent, as to the declarations of Lake on the day of the killing, being uncontradicted, and he being unimpeached, is worthy of belief.

4. Ditto of Jonathan Moore.

5. That the calmness of prisoner after being shot and bleeding, is consistent with his previous insanity and inconsistent with his previous feigned insanity.

6. That the rational conduct of the prisoner in his cell, rational answers to questions, and card playing are no evidence of feigned insanity.

7. That the absence of any proof of hereditary insanity is no evidence of feigned insanity. But the court refused to charge as requested on each and every of the points last above stated, to which refusal, defendant's counsel then duly excepted.

The jury found the defendant guilty.

*H. & M. Hale,* for plaintiff in error

I. The court erred in excluding the testimony offered in relation to the acts and declarations of the deceased, the night previous to the alleged murder. It is not necessary that the declarations be made at the *precise time* of the act in question, in order to constitute part of the *res gestæ.* (2 *Steph. N. P.*

Lake *v.* The People.

1564, *and cases there cited; Ross* v. *Bank of Burlington,* 1 *Aik.* 43, *cited* 1 *Cow. & Hill's notes* 594, 3d *Ed. p.* 215; *State* v. *Crane,* 2 *Bail.* (*S. C.*) *R.* 66, *cited* 1 *Cow. & Hill's notes,* 604, 3d *Ed. p.* 224; *Stewart* v. *The State,* 19 *Ohio,* 302, *cited* 2 *Russ. on Crimes,* 750.) The conduct of the prisoner being material evidence upon the point in issue, (his sanity,) and evidence having been given of his conduct on that day any acts or declarations connected with that conduct, and calculated to explain, unfold or throw light upon it, were admissible and material evidence. (*Wright* v. *Doe dem. Tatham,* 4 *Bing. N. C.* 489, *and S. C.* 33 *Eng. Com. L. Rep.* 426; 1 *Cow. & Hill's notes, notes* 444, 452 *and pp.* 596, 604, 3d *Ed. note* 160 *and pp.* 217, 224; 1 *Phil. Ev.* (6th *Am. Ed.*) 189 *and* 190; 1 *Starkie's Ev. pp.* 47, 48, §§ 28, 29; 1 *Green. Ev.* 136, *note and cases cited; Roscoe's Crim. Ev.* 23, *note and cases cited;* 2 *Russ. on Crimes,* 750; 2 *Steph. N. P.* 1561.)

II. The court erred in excluding evidence that the deceased, the night before the homicide, was in tears, and also in excluding evidence as to the expressions of alarm made use of by the deceased at the time. That the alarm of the deceased was proper evidence in the case is shown by the argument based upon the *assumed absence* of such alarm in the charge of the jury, and by the authorities last above cited. The proper way of showing this alarm was by the declarations made at the time by the person who was the subject of it. This comes within the principle laid down in *Willis* v. *Bernard,* 8 *Bing.* 376, *and s. c.* 21 *Eng. Com. L. Rep.* 325, *and Averson* v. *Lord Kinnaird,* 6 *East* 188; *See also House* v. *Allen,* 3 *Esp. N. P. C.* 276, *cited* 2 *Steph. N. P.* 1562; 1 *Phil. Ev.* (6th *Am. Ed.*) *p.* 189; *Barthelemy* v. *The People,* 2 *Hill* 257, *note b,* at all events it was competent to show such alarm by proof that the deceased was in tears, as offered.

III. The court erred in admitting the question, "were you imprisoned in the county jail in 1827?" asked the witness Catherine Johnson on her cross examination by the district attorney. (1 *Green. Ev.* 585, § 457, *note, and cases cited; The People* v. *Herrick,* 13 *J. R.* 84.)

IV. The court erred in admitting the question, " was she ever in the county jail?" asked W. Van Vlack by the district attorney.   See authorities last cited.

V. The court erred in receiving in evidence the record of conviction and imprisonment of Catherine Johnson in the year 1827, and in refusing to charge the jury as requested relative to the *effect* of said record.   (1 *Green. Ev.* 587, § 459; *Id.* 585, note 3; 1 *Burr's Trial, pp.* 96, 98 to 100.)

VI. The court erred in admitting the opinion of Dr. John Cooper, Jr., as to prisoner's sanity at the time of the alleged murder, he not having heard all the testimony.   (*The People v. Thurston* (*Sup. Court, Gen. Term,* 6th *Jud. Dist.*) *manuscript, and cases therein cited; Ray's Med. Jur.* 339.)

VII. The court erred in admitting the opinion of Dr. John Cooper, Jr., as to prisoner's sanity at the time of the alleged murder, formed in part from what he had *read* of the evidence in a newspaper.   See cases last cited.

VIII. The court erred in receiving the opinion of Dr. Samuel Dodge as to prisoner's sanity at the time of the homicide.

IX. The court erred in asking Dr. John Thorn the question " Do you think the conduct of Lake as described by the witnesses, an evidence of insanity?" he having heard only part of the testimony as to Lake's conduct, and that the *least important* part.

X. The court erred in admitting the opinion of Dr. Per Lee Pine, as to prisoner's sanity at the time of the alleged murder, he having heard but part of the testimony.

XI. The court erred in admitting the opinion of Dr. John Cooper as to prisoner's sanity at the time of the alleged murder, he having heard but part of the testimony.

XII. The court erred in asking Dr. John Cooper, Jr., the question, " Have you heard enough of the evidence to form an opinion?" and in admitting the answer thereto.

XIII. The court erred in excluding the questions proposed to be asked Dr. John Cooper, Jr., on his cross-examination. (*Freeman's Trial, Cayuga Oy. & Ter. p.* 302, 303, 316, 317, 364, 365; *Thurston's Trial, Tioga Oy. & Ter. p.* 43; *The Peo-*

ple v. *Thurston* (*Sup. Court, Gen. Term,*) *manuscript; Commonwealth* v. *Rogers,* 7 *Met.* 500; *McNaughten's case,* 10 *Cl and Fin.* 210, *cited in* 2 *Green. Ev.* 372, *note; Wright's case, Russ. and Ry. Cr. C.* 456, *cited Phil. Ev. 4th Am. Ed. p.* 290.) These questions were clearly admissible on the cross-examination of a medical witness for the purpose of testing the soundness of his opinion. The 15th question should not have been excluded, as it was not hypothetical in form, and the facts on which it was based were proved by Levi Vincent, and Alfred Van Vlack.

XIV. The court erred in excluding the question proposed by deft's counsel to Dr. Samuel Dodge on his cross-examination. See authorities last cited. The question was not hypothetical in its form, and the fact therein recited, was proved by Dr. Andrus, Dr. Thompson, Henry Rikert, R. G. Mooney, J. C. Ferguson and Wm. Wilkinson.

XV. The court erred in excluding the questions proposed to be asked Dr. R. A. Varick by defendant's counsel. See authorities last cited. The questions were neither of them hypothetical, the facts upon which the first **was** based, were proved by Levi Vincent, and by Cyrus Perkins. Those recited in the second, by Henry Robinson, Levi Vincent, and all other witnesses of the transaction.

XVI. The question proposed by the district attorney on the cross-examination of Dr. Varick, objected to by prisoner's counsel, and *admitted* by the court, and that proposed by prisoner's counsel on the cross-examination of Dr. Thorn, objected to by the district attorney, and *excluded* by the court, were substantially the same. The court, erred, therefore, either in admitting the former, or in excluding the latter.

XVII. The court erred in charging the jury that the *nature of the act* was no evidence of insanity. 1. As a question of *fact* it should have been left to the jury without any direction of the court. 2. Whether a question of fact or law, the ruling of the court upon it was erroneous. (*Shaw C. J. in Comm.* v. *Rogers,* 7 *Met.* 503; 1 *Beck's Med. Jur.* 789; *Dean's Med Jur.* 510, (*Art.* 2,) 516, (*Art.* 4.); *Ray's Med. Jur.* 230, 231,

§§ 217, 219; *Dr. Brigham, of the State Lunatic Asylum, Free-man's Trial, p.* 100; *Dr. Varick's testimony, error book, fol's 68, 70; Dr. Allen's testimony, error book, fol.* 169; *Dr. Couper, Jr's testimony, error book, fol.* 124; *Dr. Benedict, of the State Lunatic Asylum, Thurston's Trial, p.* 34; *Dr. Butler, of the Hartford Lunatic Asylum, Thurston's Trial, p.* 36; *Dr Nichols, of the Bloomingdale Asylum, Thurston's Trial, p.* 39.)

XVIII. The court erred in assuming, in the charge, that the deceased wife was unaffected by the prisoner's conduct in her presence, and in instructing the jury that it was for them to determine the *cause* of such indifference, the only evidence by which they could satisfactorily decide, either upon her actual state of mind or the causes which produced it having been excluded.

XIX. The court erred in undertaking to instruct the jury, as to what would or would not have been the conduct of an insane man — or as to the motives or reasons that would influence such a man's conduct. (*Dean's Med. Jur.* 516, *Art.* 5 *and* 6; *Ray's Med. Jur.* 230, *Art.* 4 *and* 5, 687; *Dr. Brigham, Superintendent State Lunatic Asylum, Freeman's Tr. pp.* 100, 101.)

XX. The court erred in refusing to charge as requested, in relation to the evidence impeaching the character of Mrs. Johnson. (*Gilbert* v. *Sheldon,* 13 *Barb. S. C. R.* 623.)

XXI. The court erred in refusing to charge as requested, in relation to the evidence of prisoner's insanity.

*T. C. Campbell,* (Dist. Att'y,) for defendant in error.

I. The charge of the court was correct on all the points wherein error is claimed by plaintiff in error. 1. In relation to the evidence of previous insanity. The propositions 5, 6, 7, then submitted to be charged are mere questions for argument to the jury. It can not be claimed they are questions of law, concerning which the presiding judge is by law bound to give instructions to the jury. 2. As to the evidence of impeachment of Mrs. Johnson. (1.) The case of Gilbert vs. Sheldon,

Lake v. The People.

(13 *Barb.* 623,) on which this exception is founded, is in opposition to the plainest rules of evidence, and should be disregarded. (*Cowen & Hill's Notes*, 768, 769, *and* 780; *Hume* v. *Scott*, 3 *Marsh.* 260; *State* v. *Boswell*, 2 *Dev.* 209; *The People* v. *Herrick*, 13 *John.* 84; *Bakeman* v. *Row*, 18 *Wen.* 151; *Fulton Bank* v. *Benedict*, 1 *Hall*, 558; 1 *Greenleaf's Evidence*, *sec.* 461.) (2.) The evidence was proper in itself, according to the decision in 13 *Barb.* as far as it went; and the only thing plaintiff in error could do, was to move to strike out the evidence, when it was not followed by proof whether the witness sought to be impeached would be believed on oath by the impeaching witness. The court did not go as far, in speaking of these subjects, as it had a right legally to go. (*Durkee* v. *Marshall*, 7 *Wend.* 314; *Gardner* v. *Picket*, 19 *Wend.* 187; *People* v. *Haynes*, 14 *Wend.* 581; *same case*, 11 *id.* 557.) The English rule is the same. (*Bar. & Cres.* 430.)

II. The ruling of the court was correct as to the reception and rejection of testimony. 1. As to the questions proposed to be put to Dr. John Cooper and others: (1.) They are merely hypothetical questions, put to gratify the curiosity of counsel. (2.) The questions are all of them double, and therefore objectionable in form. (3.) They are not questions on which a scientific man could with propriety give his opinion. (4.) The matter set forth in these questions would be very proper questions for argument to the jury, but can not be introduced as evidence by way of scientific opinions. The counsel for the defendant might with just as much propriety have asked if the witness believed the jury would find the prisoner guilty, and whether they ought to find him guilty. No inquiry as to particular facts is proper; if anything of the kind proposed is proper, it can only be the general question, " what was the state of the prisoner's mind, from the evidence, at the time of the commission of the act?" (*McNaughton's case*, 10 *Clark & Fin.* 210; 1 *Greenleaf's Ev. sec.* 460; *Rex* v. *Wright*, *Russ & R.* 456.) 2. The question to Dr. John Cooper, Jr. "Have you heard enough of the evidence to form an opinion?" was

properly allowed. (1.) It was only carrying out the previous announcement of the court, which had been assented to by the respective counsel and acted upon by them. It had been assented to by the counsel respectively, tacitly, at the very commencement of calling the scientific witnesses. It had been acted upon in the following cases, on the part of the defence: Case of Dr. Varick, case of Dr. Andrus. (2.) It was proper in itself, though not assented to. 3. The only true rule is to allow a scientific witness to give his opinion when he has heard enough evidence to enable him to form an opinion; and the doctrine that he must hear all the evidence, can not be sustained by legal authority nor common. sense. (1.) Opinion is the mere act of the mind, and when the mind is satisfied, all has been done that can be, and additional facts proved to affect the opinion would be merely cumulative evidence. (2 ) It is utterly impossible to have a witness hear all the evidence, particularly when the witness is a practicing physician. 4. The question put to Mrs. Johnson, as to her being in the county jail was proper. The only objection which could be raised to it could proceed only from her; and on her declining to answer, the court did not compel her. 5. The evidence offered, of the declaration of the murdered woman, of what took place the day before the act, can not be received. (1.) They are not offered or claimed to be dying declarations. (2.) They are not evidence, legally, not being part of the *res gesta*, or connected with the act, (2 *Russell on Crimes*, 751.) (3.) The acts of Hannah, showing she was alarmed, might have been proper, but her declarations would have been mere hearsay.

III. These positions are fortified and sustained by the decisions of the courts of this and other countries. 1. By the rule in this state, in cases of insanity, which is as follows: " in the defence of insanity to an indictment for murder, it must be proved the person charged is laboring under such mental disease as not to know the difference between right and wrong." (*The People* v. *Freeman*, 4 *Denio*, 28.) 2 The rule is the same at common law, and in England at this time.

Lake *v*. The People.

*By the Court*, DEAN, J.—The prisoner, on the seventh of June, 1853, at LaGrange, in Dutchess county, in the day time, killed his wife, or the woman with whom he cohabited, and their two infant children, these constituting his whole family. He then, with a sword and motions and language, standing at an upper window in his house, almost entirely naked, kept the people who had gathered around for the purpose of arresting him, from accomplishing their object, until he was shot. He was soon after the occurrence indicted for murder, and at the Dutchess Oyer and Terminer, in September last, tried and convicted. The defence, as usual, in cases of open, aggravated crime, was insanity. Whether the prisoner was or was not of sound mind at the time of the commission of the act, is a question with which this court has now no concern. The jury passed upon it, and had there been no questions of law arising upon the admission or rejection of evidence on the trial, it is very clear that their verdict could not, and should not, be disturbed by us. But the prisoner's counsel on the trial offered evidence which was excluded, and the district attorney was allowed to give evidence after objection on the part of the defence. To these various decisions of the court, exceptions were taken, and we are now away from the hurry and excitement of the trial, to pass upon these exceptions. If any one of them taken to material testimony is valid, it is our duty to grant a new trial, no matter what may have been the prisoner's crime, or what opinion we may entertain of his guilt. The safety of any system of jurisprudence depends upon the uniformity of its administration. By the one which it is our duty to administer, the vilest criminal is entitled alike with the purest citizen to the benefit of all the forms of proceeding, which the wisdom of our predecessors has established as safeguards for the protection of property, liberty and life. Without, therefore, in any way expressing an opinion upon the correctness of the verdict of the jury, I proceed to the examination of the questions which have been raised before us on the argument of this case.

There are very many of the exceptions which can not be sustained   There are, however, some of them which the court

are unanimously of opinion are well taken, and on which I shall now give the conclusion to which on examination I have arrived; I shall also speak of two of the exceptions which I think can not be sustained.

Where the question to be determined by a jury is the sanity of a person, both the *acts* and *declarations* of the person are evidence, for the purpose of ascertaining the state of mind of the actor. On the trial of this indictment, this rule was observed, and full latitude was given to the acts, conduct and declarations of the prisoner, both before and after the homicide. His counsel, however, proposed to go further, and prove the effect which the prisoner's conduct had on the mind of another person the day before the killing, not only by the acts, but by the declarations of the person killed, made to third persons, and in the absence of the prisoner. I can find no authority which would justify this species of evidence, and there is no reason which can sustain it. The fact to be proved is the *state of the prisoner's mind*. While his declarations at the time and before and after the occurrence, are evidence, not of the *res-gestæ*, but of the *fact to be proved*—the mental state of the prisoner—it is very clear that the declarations of third persons can not shed a ray of light on the subject of inquiry, but will, at best, furnish the jury with only the *opinion of the declarant*. Had the person whose declarations are sought thus to be given, survived, her opinion under oath would not have been testimony. Upon what principle, then, can her statements be given in evidence, without the means, by a cross-examination, or in any other way, of testing their accuracy, or ascertaining the sincerity with which they were uttered? These declarations constitute no part of the *res-gestæ*. They are of a day prior to the transaction, and are claimed to be evidence, not of the fact to be proved—the state of the prisoner's mind—but of the feelings and emotions of the deceased; a matter which is wholly immaterial to the issue on trial. Suppose what is sought to be proven by this evidence is admitted, that deceased said she was alarmed and feared the prisoner would hurt himself, does that advance the jury a single step in their inquiry? Do not sane

Lake *v*. The People.

men frighten women? Or are all men who alarm their wives exempt from criminal liability? The mere statement of the conclusion to which this species of evidence would bring us, is a sufficient argument to show its inadmissibility.

Another ground of error, which is confidently relied on by the prisoner's counsel, is the admission of a record of conviction for petit larceny more than twenty-five years old, against one of the witnesses on the trial. While I am not aware of any statute of limitations which would exclude this, I am very certain that such testimony, not followed by proof of subsequent bad character, ought to be wholly disregarded by a jury. To give it weight and say that a person who had once been guilty of an offence which in itself does not render a witness incompetent, is for life to be discredited, would be to declare that repentance and reformation were impossible, and at the same time take away one of the strongest motives for reform. I can not believe that any jury could have been influenced by this testimony, to discredit the witness against whom it was produced.

I think there was error in the rule adopted for the examination of medical witnesses. Several of those who had heard only *a portion of the testimony on which the prisoner's counsel relied to establish his defence were allowed to give their opinions founded upon the part of the testimony they had heard as to his sanity.* Although the opinions of experts are admissible evidence, yet it must be on a given state of facts; and the facts on which the opinion is based must be admitted, and must be *all* the facts relied upon to establish the theory which it is supposed these facts sustain. Every witness would otherwise come to a different conclusion, and the same witness testifying on one half the facts might give as his opinion that they indicated sanity, while the other half would satisfy him of the prisoner's madness. A question in physical science will afford an illustration. A motion which is the result of a combination of different forces, invariably changes its direction if but one of the moving powers is withdrawn. Take away half of them, it would be reversed in its course. Experts might be called to

prove any given motion; they might also be asked what would be the effect of certain combined forces, but in either case it is manifest that to have the opinion correct, *all* of the motive powers must be given. Medical men are allowed to give their opinions in cases of alleged insanity, because they are supposed by their study and practice to understand the symptoms of insanity and possess peculiar knowledge on this subject, while the jury whose opinion is ultimately to govern in the decision of the question, are believed to be incapable, without the aid of the experience and skill of these men, to judge correctly of mental phenomena. It is for this reason, and for this reason solely, that such testimony is admitted. It is evident, therefore, that if medical witnesses are to tell the jury what is the state of the prisoner's mind, they must do it on *all* the testimony which is relied on to establish insanity. And to allow it on a part, would be as dangerous in principle as to permit a juror to sit during a part of the trial and then unite with the rest in determining the verdict. The conclusion to which the members of the court have come on this point is sustained by reason and the authority of every reported case, so far as they have come under my examination or notice.

There is another question of much interest which arose on the trial of this case, on which I think an opinion should be given now. It is this: *On a trial where the question of insanity arises, can a medical witness, who is examined as an expert, be asked his opinion upon a hypothetical statement of facts?* I know that such has been the practice on trials of this kind, and am surprised to find no authority on the subject in the reports of this state. By a reference to the trial of Freeman, it will be seen that this mode of examination was adopted without objection. On the trial of this case the prisoner's counsel propounded to a medical witness, on the cross-examination, seventeen questions, all of which were excluded; some of them were perhaps objectionable in form, but they sufficiently raise the question for us now to settle the principle which should govern, in the admission or rejection of evidence of this nature. I think it is proper to allow the witness to be asked whether a certain state of facts

if proved or admitted, indicate insanity; and that for the purpose of testing the skill of the witness or the soundness of his knowledge.

On the cross-examination, the counsel may be allowed to ask even whether facts not in proof do or do not indicate insanity. The medical witness will thus not be allowed to pass upon the truth of the facts, nor make up the opinion of the jury, but give his own opinion upon a given state of facts and leave the jury to determine their truth, weigh his opinion and make their own verdict upon the whole. This is equivalent to allowing the professional witness to testify what are the symptoms of insanity, leaving to the jury, as should be done after learning what are the symptoms, to determine the whole question whether those symptoms exist, and if so, whether they are feigned or real, and also their extent.

I think, therefore, that the exceptions above indicated are well taken, and that a new trial should be granted.

Judgment reversed, and new trial granted